Ross A. CHARLES, for himself and all other shareholders of EPPERSON & COMPANY, INC., appellant, v. EPPERSON & COMPANY, INC., et al., appellees, BASIL N. HENRIKSEN, intervenor.

No. 51723.

(Reported in 137 N.W.2d 605)

410

412

October 19, 1965.

Rehearing Denied January 11, 1966.

Gary S. Gill, of Des Moines, for appellant.

Donohue, Wilkins & Donohue, of New Hampton, and Phil Gross, of Sumner, for appellees.

Hagemann & Hagemann, of Waverly, for intervenor.

Thornton, J.—This is a stockholder's derivative action, dismissed by the trial court. Defendant corporation, Epperson & Company, Inc., hereinafter referred to as the corporation, was incorporated by plaintiff Charles, defendant Epperson and inter-

venor Henriksen and commenced business in 1952. The principal business of the corporation as shown in this record was the construction of grain storage facilities and a chicken house. The incorporators had been partners.

The authorized capital stock is five hundred shares. In 1952 and 1953 stock was issued as follows: plaintiff Charles, 130 shares; defendant Epperson, 170 shares; and intervenor, 58 shares. Defendant Morton was issued one share June 1, 1960. Defendant Epperson acquired control of intervenor's 58 shares June 21, 1962, with the right in intervenor to share in the fruits of this action. No other shares have been issued. The parties are the only stockholders and now hold stock in the corporation as indicated. Defendant Epperson has at all times been a director, chairman of the board, and, president, and now is also a vice-president. Plaintiff Charles has at all times been a director. Plaintiff in argument contests such finding by the trial court. However he has so pleaded, no other import can be attributed to his reply. Plaintiff was secretary-treasurer until his retirement in October 1957. From then until November 1962 he has drawn $100 per month from the corporation. Intervenor left the corporation June 1, 1962. These three, plaintiff, defendant Epperson, and intervenor, received salaries and bonus on an equal basis until plaintiff's retirement in 1957. Defendant Morton became a director in February 1961.

The testimony of both plaintiff and intervenor shows defendant Epperson was the lead man, the business getter, the managing officer of the corporation and that they relied on his judgment and gave him a free hand in handling the business of the corporation. Plaintiff was the bookkeeper and office man, intervenor the engineer. Their testimony shows directors' meetings were not held. Plaintiff testified he wrote up minutes of meetings that were not held.

This action is in equity, triable de novo here. Rule 334, Rules of Civil Procedure. Propositions not stated or argued are waived. Rule 344(a)(4)(Third), Rules of Civil Procedure.

Plaintiff concedes the purchase of the airplane is barred by the statute of limitations and does not state or argue the use thereof by defendant Epperson.

The transactions on which plaintiff now bases his action for recovery on behalf of the corporation, wherein he contends there was wrongdoing on the part of defendant Epperson and approval and consent of defendant Morton, are 1. Ford Falcon; 2. poultry house; 3. Sumner Grain & Feed, Inc.; 4. grain dryer; 5. Sumner Builders, Inc.; and 6. E. C. Moran's bonus.

 I. The burden of proof is on plaintiff to prove his case generally as to misconduct of defendant Epperson as an officer and director. 19 C. J. S., Corporations, section 832, page 244; and 19 Am. Jur.2d, Corporations, section 584, page 108. Mere suspicious circumstances are not enough. Des Moines Bank & Trust Co. v. George M. Bechtel & Co., 243 Iowa 1007, 1070, 51 N.W.2d 174. Where a corporate director is allowed to run the business as he sees fit without obtaining the consent of other directors through directors' meetings or otherwise, such others are estopped to complain. Anderson v. Dunnegan, 217 Iowa 672, 250 N.W. 115; and Alderman v. Alderman, 178 S. C. 9, 181 S.E. 897, 105 A. L. R. 102. Where it appears a corporate director is dealing on behalf of the corporation with another corporation of which he is also a director he is required to make a full disclosure and obtain the consent of all concerned. When it appears he has not done so the burden is on him to establish the good faith, honesty and fairness of the transaction. First Trust & Savings Bank v. Iowa-Wisconsin Bridge Co., 98 F.2d 416, 425; and Des Moines Bank & Trust Co. v. George M. Bechtel & Co., 243 Iowa 1007, 1081, 51 N.W.2d 174. We said, in Gord v. Iowana Farms Milk Co., 245 Iowa 1, 18, 60 N.W.2d 820, 830:

"This rule and burden should also apply in dealings between directors who are stockholders, especially in a relatively small corporation in which the stock is closely held."

 Such director is not liable merely for failure to make full disclosure and to obtain consent but because the transaction is not in good faith, honest and fair. Such burden is not cast on an officer or director acting in the regular course of business.

 II. Plaintiff contends defendant Epperson admitted the conversion of the Ford Falcon station wagon owned by the corporation in his pleading and the stipulated cost of the car should be taken as the value in entering judgment against de-

fendants for such amount. The plaintiff must fail for lack of proof. Defendant Epperson did admit he "is using" the station wagon because he failed to deny such, rule 102, Rules of Civil Procedure, and he admitted his wife "at times had made use of the * * * station wagon for her private use," and "the total mileage as of this time upon said Ford * * * is approximately 8000 miles."

It was stipulated the following amounts were paid for the Ford, cash, $1419.27, trade-in allowance for 1958 Chevrolet, $1268.65, and that the book value of the Chevrolet at the time of trade was $250. From this plaintiff contends he is entitled to a judgment in favor of the corporation for $1669.27, the loss to the corporation.

It is apparent the amount of the use by defendant Epperson or his wife is not admitted. The admission that there is total mileage of 8000 miles does not admit such defendant or his wife put such mileage on the Ford. No other evidence was offered. In this state of the record there is no proof of conversion or of the value of the Ford at the time of the claimed conversion. See Merchants and Farmers State Bank of Weatherford, Texas v. Rosdail, 257 Iowa 1238, 1246, 131 N.W.2d 786, 790, 136 N.W.2d 286.

III. Relative to the poultry house transaction plaintiff states his contentions thus. Epperson purchased the poultry house plant and equipment with corporation funds without authority and contrary to the articles of incorporation, he used corporate funds to operate and maintain it, personnel employed and paid by the corporation were used in operating it and he retained, managed and controlled the income and accounts receivable from the operation of the poultry house in a personal checking account and expended the funds most suitable for his needs. In argument plaintiff contends Epperson so handled this transaction that if there was a loss it would fall on the corporation and if the venture was a success Epperson personally would be able to retain the profit.

We believe plaintiff's first premise that Epperson individually purchased the poultry plant cannot be sustained.

The transaction arose in this manner. In September 1957,

while plaintiff was still active in the corporation, one **Heying** purchased a four-acre tract from Epperson individually. He at the same time entered into contracts with the corporation and Farm Building Supply, Inc. (a purchasing corporation set up by plaintiff, Epperson and intervenor for purchasing purposes which for all practical purposes in the record is actually the corporation and will hereinafter be disregarded) for the construction and equipping of a poultry plant for egg production. Plaintiff took part in this. The plant was placed in operation and the construction and equipping were financed by conditional sales contracts which the corporation endorsed with recourse. Later Heying ran into financial difficulty and he, Kent Feeds, Inc., and Epperson entered into an agreement whereby Epperson undertook, as agent for Kent Feeds, Inc., to handle the proceeds of Heying's poultry operation and to pay from December 1958 through June of 1959 the operating expenses, certain payments to Kent Feeds, Inc., other indebtedness of Heying, and Heying's living expenses. In the same instrument Epperson undertook personally to guarantee the operating expenses and payment to Kent as provided for the months December 1958 through June of 1959. At this time Epperson was interested in the successful operation of the Heying poultry operation, 1, individually, as he had sold the land to Heying on an installment real-estate contract, and 2, as the largest stockholder and managing officer of the corporation. The corporation was then liable upon default of Heying on the conditional sales contracts.

There is nothing about this agreement that in any manner sustains a finding Epperson purchased the poultry plant individually. This agreement does not necessarily indicate Epperson acted for himself in the transaction to follow.

After the above agreement, Heying employed counsel and made a claim against the corporation for faulty construction of the poultry plant and equipment in that the same was improperly ventilated and insulated causing excess condensation which in turn resulted in sickness and death of a large number of chickens. Mr. Epperson employed counsel to resist and handle this claim. There is no reason to believe he then was acting solely as an individual. On the face of things he would not be

personally liable for the faulty construction, the corporation was liable if such condition existed. He signed the settlement agreement both on behalf of the corporation and individually. It was necessary for him to do so because of his installment real-estate contract.

While negotiations were going on between counsel, Heying abandoned the poultry operation. He simply walked out. When Epperson heard of this he took over to care for the chickens using corporation employees for such purpose. A number of loads of dead chickens were removed from the plant at that time.

On January 20, 1959, a settlement was reached and an agreement entered into whereby possession of the real estate was given to Epperson individually, the immediate possession of all personal property, the plant and egg business, was given to the corporation.

This agreement released the corporation from any claims of Heying for the installation of the poultry plant and provided for the payment to Heying of $3000 and the assumption by the corporation of all outstanding indebtedness of Heying in the poultry operation including the balances due on the conditional sales contracts. The total assumed was approximately $40,000. Of this amount the corporation was liable on its endorsements on the conditional sales contracts for approximately $22,000. The corporation received possession of the personal property of the poultry plant and egg business. The real estate was turned over to Epperson personally. The buildings and other improvements were described as personal property in the conditional sales contracts. This agreement was signed by Epperson both for the corporation and personally.

Plaintiff claims the signing of this agreement is some evidence Epperson was acting individually. And it is not contended by defendants that any special authority or consent to enter into this transaction was sought or received. They contend in effect it was a salvage operation, an attempt to save the corporation from financial loss. Epperson conceded on the stand it would have been better to have taken the loss at that time rather than the attempt to operate the poultry plant which resulted in a greater loss.

We think it is clear intervenor knew of the January 20,

418

1959, settlement with Heying. Also that plaintiff did. His testimony in the record shows, "Mr. Fay informed him that the poultry account wasn't set up on the records. * * * he asked Mr. Fay if Mr. Epperson had given him their copy on the deal that had been made with Heying so they could get it on their books properly and he said, 'No, Mr. Epperson had never given me anything.' and I said 'You charge everything that goes out there until this matter is straightened out on the books.' He assumed it was to be the Corporation's until Mr. Epperson had told him he took it over."

The time of this conversation does not appear. The financial statement of the company as of February 28, 1960, shows under Fixed Assets: Plant—Poultry House—Cost—$3450.02 and Equipment—Poultry House—Cost—$5334.54.

This statement was fully available to plaintiff. He cannot be heard to say that he as a director did not know the corporation had taken over the plant as of that time. It does not appear either plaintiff or intervenor took any steps toward finding out about the manner in which Epperson subsequently handled the poultry house receipts or that they or either of them complained the January 20, 1959, settlement agreement was unauthorized until this action was contemplated. As shown by the minutes of the directors' meeting on March 11, 1963, plaintiff made demand on the corporation to bring action against Epperson and Morton for the diversion of corporate funds, for an accounting, and for damages in the sum of $250,000.

We think this situation is one where first Epperson as the managing officer was not called on to obtain prior authority because it was a salvage operation not a purchase of a business in which the corporation could not engage. Certainly the managing officer can settle a claim against a corporation and enter into an agreement calculated to raise the funds to pay the corporation's liability on endorsements. Second the plaintiff and intervenor had impliedly given Epperson authority to handle transactions such as this by their past actions of leaving the business end of the corporation to him. The situation is similar though not identical to the one in Anderson v. Dunnegan, 217 Iowa 672, 683, 250 N.W. 115.

We believe it is clear Epperson was authorized to act on behalf of the corporation. Also we believe it is clear he did so act. The bookkeeping of Epperson is condemned but the bookkeeping was such that at no time was it possible to say the action taken did not show on the company books. From the settlement agreement and carrying the poultry house on the company books as an asset there was no time during this operation Epperson could have successfully claimed the ownership of the plant as against the corporation.

After the January 20, 1959, agreement a bank account under the name Epperson Farm Account was set up. Epperson testified Mr. Fay, then in charge of the corporation books, set up this account. He also testified after it was set up, "all of the receipts, every penny of the receipts from the sale of eggs and transactions of the poultry house was deposited in that account." And that, "he delivered the net income to the corporation." Actually plaintiff does not contend to the contrary. Plaintiff's certified public accountant examined the Epperson Farm Account and the canceled checks and states Epperson signed most of them, Mr. Fay 50 and B. Coleman one. No complaint is made as to the purpose of, or payees named in, such checks.

There was set up on the corporation books an account receivable, E. W. Epperson Poultry Account. The first charges made to this account as shown by plaintiff's Exhibit 1 are for pullets purchased on November 5, 1959. The total amount charged to this account was $35,178.55 for pullets, labor and taxes. There was credited to this account $20,366.43 from the Epperson Farm Account, leaving an unpaid balance of $14,812.12. There were also on the corporation books accounts labeled Poultry House, Plant; Poultry House, Equipment; and Poultry House Operating Expense. These and other expense accounts on the books of the company show expenditures by the corporation, including the payments on the conditional sales contracts, of $46,966.06. This figure and the unpaid balance in the Account Receivable, E. W. Epperson, show a total loss to the corporation of $61,878.18 on the entire transaction.

Epperson further testified Russ Meyers, a long-time employee of the corporation, was assigned to take care of the poultry business.

Neither Mr. Fay nor Mr. Meyers testified. Defendant Morton testified he had been in charge of the books since they were turned over to him January 5, 1960. And that the Epperson Farm Account was the operations account, it was not kept as a corporation account. It shows the income. He did not work on it, Bernice Coleman kept track of it.

The handling of the accounts as stated above all show the poultry plant and operation were handled by Epperson for the corporation. The only evidence to the contrary except plaintiff's testimony denied by Epperson is the undisputed fact that Epperson declared the income from the poultry operation for the years 1960, 1961 and 1962 on his personal income tax returns. The income for the years 1959 and 1963 is not shown on either the corporation's or Epperson's income tax returns. Though the income for the years 1960, 1961 and 1962 was shown on Epperson's individual tax returns he testified he turned the net balance over to the corporation. This is undisputed and no showing is made or attempted to be made that the balance of the funds in the Epperson Farm Account after crediting $20,366.43 to the Account Receivable, E. W. Epperson Poultry Account, was not used for a proper purpose or was retained by Epperson personally. This results in a situation wherein the corporation has suffered a loss on the entire poultry house transaction but there is no showing it has suffered a greater loss because of the manner in which it was handled. If the records had been properly kept and the income properly reported there is no showing the loss would have been smaller. Though the inclusion of the income by Epperson in his tax returns for the years stated is by no stretch of the imagination satisfactorily explained there is no proof of damages. The plaintiff must fail.

IV. Plaintiff presents various facets of Epperson's transactions with Sumner Grain & Feed, Inc., in six different divisions of his brief. In an amendment to his petition plaintiff alleged, 1, Epperson sold property belonging to the corporation to Sumner Grain & Feed, Inc., and appropriated the purchase price to his own personal and private affairs, and 2, Epperson entered into a contract with Sumner Grain & Feed, Inc., another corporation of which he was a director and stockholder, which

resulted in defendant corporation not receiving full payment under the contract without authority.

Sumner Grain & Feed, Inc., was incorporated by Epperson and three other men in November of 1958. The testimony of Epperson and Morgan, one of the other incorporators, is clear the intent of the three incorporators other than Epperson was to start a grain storage business and finance the entire operation without investing more cash than necessary. The other three approached Epperson on the matter. The four, including Epperson, were directors and each gave a check for $5500 for stock and in return received a check for physical assets sold to the corporation. Epperson on behalf of the corporation sold and erected for Sumner Grain & Feed, Inc., an office, grain storage for 100,-000 bushels of grain and three grain bins for 15,000 bushels.

Plaintiff's claim that defendant Epperson appropriated the purchase price of corporation property sold to Sumner Grain & Feed, Inc., is that the corporation sold to Sumner Grain & Feed, Inc., a Vac-U-Vator and three grain bins, and that Epperson converted the down payment on the Vac-U-Vator and the entire price paid for the three grain bins. His claim Epperson entered into a contract with Sumner Grain & Feed, Inc., which resulted in the corporation not receiving full payment is based on Exhibit P-15, a conditional sales contract between the two corporations for the sale of "One 50' x 160' x 14' Butler RFSG building and accessories, and one 24 x 30 x 8' Butler Panl Frame building with accessories, both buildings completely erected and with concrete foundations and floors" for a total contract price of $56,-704.93, down payment of $11,752.23, and an unpaid balance of $44,952.70. His claim here is the corporation did not receive the down payment. He also contends in this regard Epperson failed to collect or secure an additional $7229.42 due from Sumner Grain & Feed, Inc., to the corporation.

Plaintiff's evidence relative to appropriating the purchase price is based on the records of the two companies and Epperson's personal bank account. These records, unexplained, indicate Epperson received the down payment on a Vac-U-Vator sold to Sumner Grain & Feed, Inc., on November 17, 1958, in the amount of $1784 and for three grain bins in the amount of $4039.

There is no question but Epperson delivered a check for $5500 marked stock loan and received stock and three checks from Sumner Grain & Feed, Inc., all dated November 20, 1958, in the following amounts: $4039.20, $1460.80 and $359.05. The first two it will be noted amount to $5500, the amount paid by Epperson for his stock on the same date. Sumner Grain & Feed, Inc., records show the $4039.20 check was issued Epperson in payment for three grain bins and its records show the $1460.80 check and the $359.05 check were issued as the down payment on the Vac-U-Vator. The corporation records show job costs on the grain bins over a period from November 25, 1958, to February 10, 1959, and its records do not show this work was billed to Sumner Grain & Feed, Inc., or the corporation received payment for this work. Epperson's explanation is the cost of this work was included in the conditional sales contract assigned to Butler Finance Company, Exhibit 15. His explanation of the down payment on the Vac-U-Vator is to like effect but it has other aspects. On November 17, 1958, the $1784 down payment appeared in the corporation books as an account receivable from Sumner Grain & Feed, Inc., on August 8, 1959, it was removed from that account and shown as an account receivable, Epperson, on November 11, 1960, it was removed at Epperson's direction to Job Costs, Job 385. The corporation records show the Vac-U-Vator was sold to Sumner Grain & Feed, Inc., for a total selling price of $5792.36, a down payment of $1784, a note dated January 20, 1959, due quarterly was taken for the balance of $4008.36. We think Epperson's testimony amounts to a concession he owes the corporation the down payment of $1784. On direct examination he testified as follows:

"Q. Will you inform the court what, if anything, was contributed, as far as you are personally concerned or Epperson Company was concerned, for the issuance of the 55 shares of stock in Sumner Grain & Feed? A. The only thing that was contributed other than what was included in the basic contract would be the Vac-U-Vator which is $1780, which is the only item contributed offsetting the stock issue."

On cross-examination, "* * * The only contributing factor, as far as Epperson Company was concerned, involved, was the

Vac-U-Vator sale. * * * I got my $5500 stock for $1700 and some dollars, wouldn't that be right, * * *. It was paid for * * * by Epperson & Company and charged to Sumner Grain which was in turn charged from Sumner Grain back to myself, personally. * * * it is now finally wound up in job costs, understand, * * *. It is now in there because I considered from the promoting of the deal the corporation had a very nice deal out of the whole thing without having suffered in any manner, shape or form.

"Q. But, the corporation * * * paid the $1700 for which you personally received $5500 worth of stock? A. That's right."

Even under the loose operation of this corporation Epperson cannot vote himself a bonus in this manner.

█ V. The three bins present a different picture. Plaintiff contends the evidence relative to what is included in the conditional sales contract, Exhibit P-15, is inadmissible under the parol-evidence rule, he makes the same contention concerning the down payment stated therein. In this he is mistaken, the parol-evidence rule is not applicable where as here the written instrument is a collateral piece of evidence and the action is not based on it. Bales v. Massey, 241 Iowa 1084, 1091, 43 N.W.2d 671; Cedar Rapids National Bank v. Carlson, 156 Iowa 343, 351, 136 N.W. 659; and First National Bank in Oshkosh v. Scieszinski, 22 Wis.2d 30, 125 N.W.2d 577, 581. Plaintiff also urges such evidence is inadmissible because no special defense was pleaded setting up the issue. Here again plaintiff is mistaken, he pleaded defendant Epperson entered into a contract with Sumner Grain & Feed, Inc., "* * * which resulted in defendant corporation not receiving full payment under the terms of the * * * contract." Plaintiff did not declare on the conditional sales contract, Exhibit P-15, but merely offered it in evidence as the contract. Defendant in turn offered evidence that Exhibit P-15 was not the contract between the corporation and Sumner Grain & Feed, Inc., that there was an oral agreement and Exhibit P-15 was only used to finance the full payment to the corporation under the oral agreement. This tends to negative plaintiff's case that the corporation did not receive full payment under the contract actually entered into for construction. Again the contract is not

the basis of the action where a defense of payment must be pleaded. What defendant's evidence shows, if credible, is there was no contract on which the corporation did not receive full payment, or that in fact received full payment of the funds due it and how it was paid. Heaberlin v. Heaberlin, 255 Iowa 403, 122 N.W.2d 841, cited by plaintiff actually supports this holding. Plaintiff's other authorities are Olson v. Roberts, 218 Iowa 410, 255 N.W. 461, a claim in probate; Columbia College v. Hart, 204 Iowa 265, 213 N.W. 761, foreclosure of note and mortgage; and Siegel Market v. Billings, 203 Iowa 190, 210 N.W. 749, an action on an account. The difference between those cases and this one is apparent. Of course a plea of payment was necessary in each of them. Stated another way, plaintiff's claim is defendant has damaged the corporation by not obtaining a payment due it, defendant's evidence tends to negative such claim.

In this state of the record with plaintiff's case based on the indicated records the burden falls on defendant Epperson to offer evidence to convince the trier of fact, in this case this court, plaintiff's evidence does not disclose the true situation and what the true situation is. This is true whether such ruling is based on Epperson's duty to go forward with evidence to convince the trier of fact or is based on the rule a common director handling the transaction between two corporations has the burden to establish his good faith, honesty and fairness. Des Moines Bank & Trust Co. v. George M. Bechtel & Co., 243 Iowa 1007, 1081, 51 N.W.2d 174.

Defendant's evidence is the amount due the corporation for the three grain bins is included in Exhibit P-15, the conditional sales contract, and the check from Sumner Grain & Feed, Inc., to him for $4039.20 is the return of part of what he paid for his stock in Sumner Grain & Feed, Inc., and that the entry in Sumner Grain & Feed, Inc.'s books was merely to make its financial picture look better. We simply do not believe Epperson's evidence should be given sufficient credence to offset plaintiff's evidence.

The only witnesses testifying for defendants on this issue were the two defendants, Epperson and Morton. Epperson merely states the cost of the grain bins was so included. He

makes no showing of the total of items and costs for such items included in Exhibit P.-15. Morton's evidence is to the same effect. Plaintiff urges vigorously Morton's testimony on this issue is inadmissible. We do not bother to consider this because if all of his evidence is admissible the result would be the same. He purported to testify from the corporation's books that the cost of the grain bins was included in Exhibit P-15. He was not employed by the corporation at the time the entries were made and disclosed no way he could know what was contained in Exhibit P-15. He apparently had the records with him but again no showing was made or attempted as to each of the separate items included in the contract. We think this evidence should have been available to the defendants. In fact no reason is given or suggested why defendants would not have had available from the books a complete breakdown of all items included in the contract. The total received under Exhibit P-15 from the finance company and the total amount claimed included was shown, but nothing further.

Defendant did call Mr. Morgan, one of the incorporators of Sumner Grain & Feed, Inc., its secretary-treasurer and man who signed on behalf of Sumner Grain & Feed, Inc., the $4039.20 check to Epperson. This witness was not asked concerning the check or the inclusion of the cost of the three grain bins in Exhibit P-15. This witness was asked, after examining Exhibit P-15:

"Q. Can you inform the court the amount that Sumner Grain & Feed paid to Epperson & Company for the construction of the building? A. That was the $44,952.70. This was the amount of money we were going to pay for the merchandise, the two buildings we were to receive from the Epperson Company."

This answer tends to sustain plaintiff as to the three grain bins and not defendants.

 We hold as a matter of fact defendant Epperson received and converted to his own use the $4039.20 due the corporation.

 Defendant Epperson contends these transactions are barred by the five-year statute of limitations, section 614.1(5), Code, 1962, and laches in that the transactions occurred in No-

vember 1958 and plaintiff did not make this claim until he filed an amendment to his petition in April 1964. Section 614.4, Code, 1962, provides a cause of action for fraud shall not be deemed to have accrued until the same has been discovered by the party aggrieved. This appropriation of funds is a fraud on the corporation. Section 491.41, Code, 1962, and 37 C. J. S., Fraud, section 1, page 204. The.evidence detailed above shows clearly defendant sought to cover the $1784 in the books and the $4039.20 received for the grain bins appeared in the books, if at all, only in the job costs. Epperson's knowledge of course was not knowledge to the corporation. Des Moines Bank & Trust Co. v. George M. Bechtel & Co., 243 Iowa 1007, 1087, 51 N.W.2d 174. Reasonable diligence on the part of plaintiff and intervenor would not have discovered these matters without an audit. Defendant Epperson has not carried the burden of these defenses. Des Moines Bank & Trust Co. v. George M. Bechtel & Co., supra, at pages 1091 and 1097 of 243 Iowa.

 VI. Plaintiff's claim Epperson failed to properly collect or secure payments due the corporation cannot be sustained. Plaintiff's contention as to the down payment of $11,-752.23 shown in Exhibit P-15 is adequately explained by Mr. Morgan and Epperson. Their testimony shows this amount was falsely inserted in the contract to induce the finance company to loan $35,257, the amount received by the corporation. The difference between this amount and the $44,952.70 is the interest figured in advance. The $11,752.23 was never paid nor was such the intention of the parties. The finance company was the only one to be injured by this transaction. Plaintiff cannot complain on that score.

VII. Plaintiff contends Epperson should be held personally liable to the corporation for the amount Sumner Grain & Feed, Inc., still owes it of $7229.42. This amount is now included in two notes, one in the amount of $5726.31 representing the balance due on open accounts, $4500 the balance due on the sale of a scale and $1226.31 for miscellaneous items sold to Sumner Grain & Feed, Inc., from 1959 through 1962. The other note was given for the balance of $4008.36 due on the Vac-U-Vator, five quarterly payments were made on the note from 1959 through

April 1960, showing a balance of $1503.11. Since the last credit the Vac-U-Vator has been repossessed and sold leaving a balance of $828.11.

Defendant Epperson acquired all the outstanding stock of Sumner Grain & Feed, Inc., and has sold the entire assets of that company on a contract which has been assigned to the First National Bank of Sumner for handling. From the testimony of the vice-president of the bank it is reasonably certain this contract is sufficient to pay other creditors and leave approximately $10,000 available to pay the $6554.42 owed to the corporation. It also appears the corporation will make a profit of $7000 on the construction work performed for Sumner Grain & Feed, Inc. This is in addition to the amount we are requiring defendant Epperson to pay to the corporation.

Plaintiff's chief complaints here are not only did Epperson fail to show good faith, full disclosure and consent of all concerned, but he did not take proper steps to adequately protect the corporation on the indebtedness due from Sumner Grain & Feed, Inc. Outside of the keeping of the payments which we hold Epperson must repay, the transactions with Sumner Grain & Feed, Inc., were beneficial to the corporation. Reasonable assurance of the payment of the indebtedness has been made by Epperson in handling the sale of the Sumner Grain & Feed, Inc., assets. The corporation will be in the same position it would have been had plaintiff and intervenor consented to the transaction. Except as to the money Epperson must repay, the fairness of the transactions has been established by defendants.

VIII. Plaintiff contends defendant Epperson should be held liable to the corporation for the amount of net experimental and development expenses of $16,732.26 incurred by the corporation in developing and obtaining a patent on a grain dryer. This claim is based on Epperson having the patent issued in his own name and his claimed use of the patent by Eppeco, Inc., another corporation formed by Epperson. The patent was issued in Epperson's name. He claims that at all times it has been in the corporation files and is corporation property.

Plaintiff must fail in this claim because there is no showing of damage to the corporation or actual infringement of the pat-

ent by Eppeco, Inc. Plaintiff's evidence in addition to the patent consists of a letter written by Epperson, the testimony of three incorporators of Eppeco, Inc., and a brochure showing the type of grain dryer proposed by it. The testimony of the other incorporators is not helpful. None of them had sufficient knowledge of what was being sold by Eppeco, Inc., or the patent of the corporation to give any testimony on which a finding could be based. The letter of defendant Epperson indicates he was intending to incorporate his prior acquired knowledge in the grain drying apparatus put out by Eppeco, Inc. Plaintiff asks us to compare the patent and Eppeco's brochure. This is no more helpful than the testimony of the incorporators. Both apparently are based on the theory of forcing heated air through the grain to dry it and recirculating the grain as desired. Plaintiff also calls our attention to a brochure of Dry-o-Matic Equipment Company of Sioux City, the drying operation indicated there is apparently similar.

Intervenor, an engineer, was called by defendants and testified he performed experimental work on the perfecting of the patent. He thought all the dryers that were built were built before the patent was issued. He did not think any were built after that.

Defendant Epperson testified Eppeco, Inc., never made anything similar to the patent.

All plaintiff has done is show suspicious circumstances. There is no evidence of Eppeco, Inc., making or selling the patented dryer.

IX. Plaintiff's next complaint is in regard to Sumner Builders, Inc., a corporation organized by intervenor and defendant Epperson January 1, 1962. The purpose of the corporation was to supply labor as a subcontractor on jobs sold by the corporation. Material and equipment on such jobs was to be furnished by the corporation. The record shows Sumner Builders, Inc., operated until intervenor left the corporation in June of 1962. The evidence shows on the labor performed by Sumner for the corporation Sumner lost $70.79 and the corporation paid on dissolution of Sumner $70.79 withholding taxes and $1.50 filing fee. Intervenor and defendant were paid the amount of their

investment in full. Plaintiff contends he should have judgment for the $72.29. The trial court found, and we agree, requiring Epperson to pay this amount was not equitable. The record shows a legitimate corporate purpose in the organization of Sumner Builders, Inc., by defendant Epperson and intervenor insofar as the corporation is concerned. Intervenor was placed on Sumner's payroll and removed from the corporation's payroll during the time Sumner was operating. He continued to perform engineering services for the corporation during this period. No actual loss has been suffered by the corporation.

X. Plaintiff's last complaint is defendant Epperson paid E. C. Moran a $1000 bonus on termination of his employment in violation of his fiduciary duty to the corporation without full disclosure and consent of all concerned when E. C. Moran had not been an employee of the corporation for three years. The evidence shows it had been the practice of plaintiff, defendant Epperson, and intervenor to pay not only themselves bonuses without board action but throughout all the time plaintiff was active had so paid bonuses to employees. E. C. Moran started to work for the corporation in 1956 and was on its payroll until September 1960, when he was placed on the payroll of Farm Building Supply, Inc., and so remained until the bonus was paid. Farm Building Supply, Inc., was a corporation formed by plaintiff, defendant Epperson, and intervenor for the express purpose of making wholesale purchasing available, the corporation as a construction company could not purchase as advantageously. Its stock was held as follows: The corporation 60 shares and each of the incorporators held 50 shares. Its profits would be shared equally by plaintiff, defendant Epperson, and intervenor. It was in fact the other self of the corporation. At the time E. C. Moran was first employed a written memorandum in intervenor's handwriting provided for the bonus. This memorandum was unsigned and not produced at the trial. Mr. Moran based his claim on it. Defendant Epperson consulted counsel and on the advice obtained paid the bonus. Plaintiff is estopped to complain. He was active when Mr. Moran was hired. The practice of paying bonuses to employees had been followed with plaintiff's acquiescence and participation. He had always left the business end of the

corporation to defendant Epperson. Defendant Epperson had no reason to believe he should obtain plaintiff's consent to this transaction. He was merely settling a claim against the two corporations.

XI. The plaintiff has failed to prove his action except as to the down payment of $1784 for the Vac-U-Vator and $4039.20 received by defendant Epperson for the three grain bins. Plaintiff contends the proper measure of damages is the loss to the corporation. This is correct. Des Moines Bank & Trust Co. v. George M. Bechtel & Co., 243 Iowa 1007, 1035, 51 N.W.2d 174. However, plaintiff's proof of the percentage of gross profit on sales of 16 percent is not convincing as the proper amount to be allowed per annum as the loss to the corporation in addition to funds actually appropriated. The loss to the corporation is $5823.20, the amount actually misappropriated, plus interest at five percent per annum, the legal rate, from the date of the misappropriation, November 20, 1958, and judgment and decree for such compensatory damages shall be entered as hereinafter directed..

XII. Plaintiff contends under the record defendant Epperson is liable for punitive or exemplary damages. He cites in support of this proposition Sebastian v. Wood, 246 Iowa 94, 66 N.W.2d 841; Amos v. Prom, Inc., 115 F. Supp. 127; Kirtley v. Bankers Life & Casualty Co., 198 F. Supp. 30; and the same case, Bankers Life & Casualty Co. v. Kirtley, 307 F.2d 418. In Sebastian, an automobile case based on reckless, wanton and grossly negligent operation of the automobile by defendant, it is pointed out the opinions of this court have always emphasized the purpose of exemplary damages was the punishment, and prevention of similar offenses. The Kirtley case was an action at law by the trustee in a corporate reorganization against defendant corporation based on a scheme to defraud the plaintiff corporation in the transfer of stock for a note and mortgage worth much less than the stock. The action was tried at law to a jury. If the corporation, or in such instance the trustee, had refused to bring the action it could have been brought by a stockholder as a derivative suit in equity the same as the present suit. Likewise this action for the recovery of money wrongfully appropri-

ated or for conversion because Epperson sold corporate property and retained the purchase price, Merchants and Farmers State Bank of Weatherford, Texas v. Rosdail, 257 Iowa 1238, 131 N.W.2d 786, 790, 136 N.W.2d 286, could have been brought at law by the corporation except for the refusal to do so. Liken v. Shaffer, 64 F. Supp. 432, 441.

Defendants cite no authority bearing on exemplary damages.

The modern trend is for an equity court to award such damages especially where the same court administers legal and equitable relief. 22 Am. Jur.2d, Damages, section 239, page 327; Annotations, 48 A. L. R.2d 955; I. H. P. Corp. v. 210 Central Park South Corp., 12 N. Y.2d 329, 239 N. Y. S.2d 547, 189 N.E. 2d 812; International Bankers Life Insurance Co. v. Holloway, Tex., 368 S.W.2d 567, 582–584; and Hedworth v. Chapman, 135 Ind. App. 129, 192 N.E.2d 649. We have one court of general jurisdiction which administers all Iowa law. Iowa Constitution, Article V, section 6; and section 604.1, Code, 1962.

No reason appears why recovery should be less or different in this case from one brought by the corporation at law. The reason to punish the wrongdoer and set an example is the same in one case as the other. In Kirtley, supra, Judge Stephenson examined the Iowa law and Judge Graven's opinion in Amos v. Prom, Inc., supra, and reached the same conclusion, in short, the intentional wrongful act of defrauding will support an award of exemplary damages. In Bankers, supra, the Eighth Circuit approved such ruling but with one judge dissenting required a remittitur of the amount of the exemplary damages under pain of a new trial because the amount thereof was excessive. In Syester v. Banta, 257 Iowa 613, 628, 629, 133 N.W.2d 666, 676, a damage action for fraud, we carefully examined and approved the following from Judge Graven's opinion in Amos v. Prom, Inc., supra, at pages 136 and 137 of 115 F. Supp.:

"The rule would seem to be: exemplary damages may be awarded where defendant acts maliciously, but malice may be inferred where defendant's act is illegal or improper; where the nature of the illegal act is such as to negative any inference of feeling toward the person injured, and is in fact consistent with

a complete indifference on the part of defendant, liability for exemplary damages is not based upon the maliciousness of the defendant but is based, rather, upon the separate substantive principle that illegal or improper acts ought to be deterred by the exaction from the defendant of sums over and above the actual damage he has caused."

See also Robinson v. Home Fire & Marine Insurance Co., 244 Iowa 1084, 1093, 59 N.W.2d 776, 782, "* * * malice in law— the intentional doing of a wrongful act without just cause or excuse."

Casey v. The Ballou Banking Co., 98 Iowa 107, 116, 67 N.W. 98, supports the proposition exemplary damages may be awarded in an action for conversion.

We hold that an equity court may in its discretion award exemplary damages for an intentional act of fraud. Under the record made here such becomes our duty. The mere payment of compensatory damages is not punishment or a deterrent, but an invitation for the wrongdoer and others to continue to do likewise secure in the conviction they will not be punished. Such a result would encourage such action. Vogel, J., in his dissent to the remittitur in Bankers Life & Casualty Co. v. Kirtley, supra, at page 427 of 307 F.2d.

Payment of exemplary damages here would mean punishment to Epperson and a deterrent to others. In this case Epperson has relied on the trust and confidence placed in him by plaintiff and intervenor to run the business. An award of exemplary damages here will deter others similarly situated.

The wealth of Epperson does not appear in exact figures but the record made shows his ownership of two farms and interests in two corporations plus an above average earning capacity. Exemplary damages in the sum of $7500 are proper under the record and are hereby awarded.

XIII. Plaintiff does not contend a case is made against defendant Morton on the matters wherein Epperson is held liable and the case as to Morton is dismissed.

The case is affirmed as to defendant Morton and as to defendant Epperson except as to the amounts misappropriated by him as set out in Division XI. As to such amounts the case is

reversed and remanded with directions to enter judgment and decree against defendant Epperson and in favor of the corporation for compensatory and exemplary damages as herein set out. —Affirmed in part, reversed in part and remanded with directions.

GARFIELD, C. J., and LARSON, SNELL, MOORE and STUART, JJ., concur.