## In re MID AMERICA BROADCASTING OF TOPEKA, INC., Debtor.

### Bankruptcy No. 83–40985.

United States Bankruptcy Court,
D. Kansas.

Nov. 19, 1984.

Charles R. Hay, Goodell, Stratton, Edmonds, Palmer & Wright, Topeka, Kan., for Mid America Broadcasting of Topeka, Inc.

David M. Segal, Trustee.

Mendal Small, Spencer, Fane, Britt & Browne, Kansas City, Mo., for trustee.

James P. Rankin, Eidson, Lewis, Porter & Haynes, Topeka, Kan., for Coe and Thompson.

Michael W. Thompson, Mitchell, Kristl & Lieber, Kansas City, Mo., for Cale W. Hudson.

David A. Lander, Husch, Eppenberger, Donohue Elson & Cornfeld, St. Louis, Mo., Joe B. Whisler, Chanute, Kan., for Larry D. Hudson.

Jeffrey L. Willis, Minter & Willis, Wichita, Kan., for Southwest Nat. Bank.

Carol A. Park, Asst. U.S. Trustee, Wichita, Kan.

## ORDER

JAMES A. PUSATERI, Bankruptcy Judge.

This proceeding is before the Court on the trustee's application to sell all of the assets of the debtor. An objection to the sale was made by certain equity security holders of the debtor corporation. The same equity security holders seek alternative relief, should the sale be approved, of allowance as an administrative expense sums they invested in stock of the debtor post-petition.

The appearances by the parties are as follows: Charles R. Hay, Goodell, Stratton, Edmonds, Palmer & Wright, Topeka, Kansas, attorney for Mid America Broadcasting of Topeka, Inc.; David M. Segal, Denver, Colorado, Trustee; Mendel Small, Spencer, Fane, Britt & Browne, Kansas City, Missouri, attorney for the trustee; Carol A. Park, Assistant U.S. Trustee, Wichita, Kansas; James P. Rankin, Eidson, Lewis, Porter & Haynes, Topeka, Kansas, attorney for stockholders Dean M. Coe and Larry P. Thompson; Michael W. Thompson, Mitchell, Kristl & Lieber, Kansas City, Missouri, attorney for Cale W. Hudson; David A. Lander, Husch, Eppenberger, Donohue, Elson & Cornfeld, St. Louis, Missouri, and Joe B. Whisler, Chanute, Kansas, attorneys for Larry D. Hudson; Jeffrey L. Willis, Minter & Willis, Wichita, Kansas, attorney for Southwest National Bank.

At the conclusion of the hearing held on October 17, 1984 the parties were asked to address the following issues:

1. Is the stockholder derivative action now pending an assignable asset of the debtor?

2. Are punitive damages recoverable in suits at equity in Kansas?

3. Is it appropriate to treat capital contributions made during the chapter 11 proceeding as loans for which administrative expense priority may be granted?

Memoranda have been submitted and the matter is ready for decision.

Before the issues of this case are discussed some background information gleaned from this and other hearings would be helpful in understanding the present situation.

The debtor's primary business is operation of KLDH TV, Channel 49, in Topeka, Kansas. KLDH TV went on the air in mid-1983 in an undercapitalized condition but with a line of credit in the approximate amount of $750,000. Shortly thereafter, disputes arose among the equity security holders. These disputes ultimately resulted in the filing of several state court actions. In those actions Larry D. Hudson is the primary party on one side while Cale Hudson, Larry's brother, and Larry P. Thompson, Dean M. Coe, Robert J. Earley and Terri Tharp are generally aligned on the other side.

After a lengthy hearing in October, 1983 the Neosho County District Court entered preliminary rulings adverse to the interest of Larry D. Hudson in the state court action which contains counts constituting a stockholder derivative suit. Soon thereafter, on November 18, 1983, the corporate debtor filed a proceeding in chapter 11 in this Court.

During the early course of this proceeding it became apparent that the debtor had insufficient operating capital and was suffering a shortfall of income to meet expenses in excess of $100,000 per month. During a conference called by the Court in December the problem was discussed. It was determined that the parties could find no outside lending source willing to fund operation of the television station on an unsecured basis. The station had no collateral which could be offered to a lender to reasonably secure such funding. The par-

ties were unwilling or unable to make personal loans to the corporation under § 364. The Court suggested that administrative insolvency would result in probable conversion of this case to a chapter 7 proceeding unless a loan was forthcoming or stock was issued to the present shareholders. All parties agreed to a stock offering which would allow the present shareholders to retain their percentage ownership and also would allow them to pledge the newly issued shares. The stock offer was of 1,111 shares at $388.20 per share with the first round of bidding to be completed by December 28, 1983. The date was extended at the request of all parties to permit the securing of a $200,000 loan and possible settlement of the litigation which had damaged the station's ability to obtain working capital. Neither the loan nor the settlement materialized and the stock offering was made. The issue was fully subscribed and proceeds from the sale totalling some $431,290.20 became available to the corporation to cover approximately three months of operating losses.

In early February, 1984 the Court remanded the stockholder derivative action to state court for a trial scheduled in April, 1984.

Shortly thereafter, the debtor again needed money to meet its monthly losses and the parties again agreed to seek loans and, should that quest fail, to issue stock under the same conditions as had been authorized in December.

During a severe ice storm on March 18, 1984 the debtor's 1,439 foot broadcast tower collapsed. When the station came back on the air some days later, the temporary tower which was erected permitted only greatly reduced coverage. The tower was insured and is now in the final stages of replacement; however, the debtor had no business interruption insurance and thus its already precarious financial position was dealt a severe blow. The second stock offering, to be held in late March, suffered from a lack of willing offerors, and no stock was sold. At a hearing before the Court in early April, the parties ultimately agreed to a "control block" stock issue. At a hearing in early May, the "control block" auction Order was rescinded by this Court for reasons stated of record and a trustee was ordered appointed. On May 9, 1984 David Segal accepted the position of trustee.

Since appointment of a trustee, Larry D. Hudson has extended loans to the debtor to enable it to operate. The trustee was unable to obtain loans from any other source. The loans constitute administrative expenses pursuant to § 364 of title 11. Shortly after his appointment, the trustee announced his intention to seek buyers for the assets of the debtor. Though a number of brokers were contacted and the availability of the station was widely known, no legitimate offer for the debtor's assets has been made other than by Larry D. Hudson. All parties admit that a sale seems to be the only way to avoid financial disaster for the debtor and KLDH TV. In fact, it would appear to be the only method of keeping the TV station on the air and continuing the employment of its 30 or so employees.

The debtor has obligations totalling some $6,885,490 and assets of approximately $4,764,224 of which $350,000 is the capitalized amortized cost of acquiring the FCC license and Industrial Revenue Bonds.

The debtor's monthly losses since April have averaged $130,000; however, the August and September average is $98,500.

The only bid to purchase the assets of the debtor has been made by Larry D. Hudson. The bid is for all of the assets and encompasses payment or assumption of all pre-filing debt and leaseholds and all post-filing administrative expenses. All lessors and secured creditors have either affirmatively agreed to the bid or have not objected to it.

The stockholders' derivative action was not valued by the corporation or the trustee in arriving at corporate asset value. The derivative action seeks recovery of certain payments to Larry D. Hudson or corporations or other business entities under his ownership and/or control which are alleged to have been improperly paid. The improper payments are alleged to have

been in the amount of $421,000 to Midwest Telco and unknown amounts improperly paid to Larry D. Hudson for management services. By no party's estimate would these payments, even if recoverable in whole, exceed one million dollars. The payments more than likely would not exceed $600,000. Other personal actions by various stockholders are joined in the lawsuit; these do not constitute a corporate asset and thus would remain to be litigated even if the derivative action is included in the corporate assets sold to Larry D. Hudson. The action also seeks punitive damages.

*Is the Stockholder Derivative Action an Assignable Asset of the Debtor*

Even before the passage of the Bankruptcy Reform Act of 1978 which included a broadened concept of property of the estate, stockholder derivative actions were considered property of the estate. *Meyer v. Fleming*, 327 U.S. 161, 66 S.Ct. 382, 90 L.Ed. 595 (1946). This concept is continued in § 541 of title 11. See the legislative history of § 541, House Report No. 95–595, 95th Cong. 1st Sess. 367 (1977), Senate Report No. 95–989, 95th Cong., 2nd Sess. 82, (1978), U.S.Code Cong. & Admin.News 1978, p. 5787; 4 Collier on Bankruptcy, § 541.10 pg. 541–67 (15th Ed.1983).

It appears that a substantial argument can be made that federal law would allow the assignment of the cause of action even in the face of contrary state law. The supremacy clause of the constitution provides that where state law conflicts with federal law, the former must yield. U.S. Const. art. 6, cl. 2. The power to enact bankruptcy legislation belongs to Congress. U.S. Const. art. 1, § 8, cl. 4. The trustee has the power under 11 U.S.C. § 363(b)(1) to "use, sell, or lease ... property of the estate." *Meyer v. Fleming* states that the trustee has broad powers with respect to an action belonging to the estate, even up to the ultimate power to cause the case to be abated. 327 U.S. at 168, 66 S.Ct. at 386. See also *Houghton v. Enslen*, 261 Fed. 113 (5th Cir.1919); *In Re Penn Central Transportation Company*,

337 F.Supp. 791 (E.D.Pa.1972). Consequently it follows that the trustee may also have the power to assign a derivative action under federal bankruptcy law. See *Note*, Assignability of the Corporate Cause of Action Against Directors for Fraud, 45 Yale L.J. 525 (1936). As the following discussion will show, however, the action is assignable under the law of Kansas, and therefore the question of primacy of federal law does not have to be reached.

The objecting equity security holders base their contention that the derivative action is not assignable under Kansas law on *Howe v. Mohl*, 168 Kan. 445, 214 P.2d 298 (1950) and *Old Colony Ins. Co. v. Kansas Public Service Co.*, 154 Kan. 643, 121 P.2d 193 (1942). Their reliance is misplaced because it overlooks a line of cases holding that tort actions of the type involved here are indeed assignable.

In *Hewey v. Fouts*, 91 Kan. 680, 139 P. 407 (1914), Fouts had allegedly induced Davis to buy a number of "White House pantries" by fraudulently representing to him that there was profit to be made in their resale. Davis assigned his claim to Hewey, who had a similar claim against Fouts. In the portion of the opinion dealing with the assignability of Davis' cause of action, the court ruled that Davis could make a valid assignment of his right to reclaim the money wrongfully obtained from him. Therefore Hewey could maintain an action upon Davis' claim to the extent of recovering whatever Fouts profited by the transaction, but no further. The court based its conclusion upon an ancient rule that "whenever one person commits a wrong or tort against the estate of another, with the intention of benefitting his own estate, the law will, at the election of the party injured, *imply* or presume a contract on the part of the wrongdoer to pay to the party injured the full value of all benefits resulting to such wrongdoer." 91 Kan. at 683, 139 P. 407.

The Kansas Supreme Court's next opportunity to consider the question was *Allis Chalmers Mfg. Co. v. Security Elev. Co.*, 140 Kan. 580, 38 P.2d 138 (1934), a claim

for conversion of wheat. The Kansas Supreme Court cited the *Hewey v. Fouts* rule and held that although the cause of action was in tort, it was nevertheless assignable. The court went on to clarify *Hewey* by stating that the measure of recovery is the value of the property, regardless of any failure by the tortfeasor to profit by his dealings in the property. 140 Kan. at 583, 38 P.2d 138.

Both of these cases have their roots in ancient cases including *Fanson v. Linsley*, 20 Kan. 235, Syl. ¶ 2 (1878), and *Stewart v. Balderson*, 10 Kan. 131 (1872).

The rule of *Hewey v. Fouts* and *Allis Chalmers* contrasts with the rule of the cases relied on by the objecting equity security holders (and also of *Redmon v. Salisbury Co.*, 178 Kan. 639, 290 P.2d 809 (1955) and *St. Paul Fire & Marine Ins. Co. v. Bender*, 153 Kan. 752, 113 P.2d 1062 (1941) not cited by the equity security holders). The rules are not conflicting, however, because the rule cited by the objecting equity security holders applies to torts that did not result in benefit to the tortfeasor's estate. The type of damages sustained in each of those cases was of the sort from which no one benefits, for example damage to a house due to a gas explosion or damage to an automobile due to a collision.

Because it applies to different types of torts, the rule of the *Howe* line of cases does not affect the rule of the *Allis Chalmers* line of cases. Furthermore, in *St. Paul*, one of the cases in the *Howe* line, the Kansas Supreme Court expressly referred to *Allis Chalmers* and stated that it was still good law and not in conflict with the *St. Paul* decision. *Allis Chalmers* has never been overruled.

It should also be noted that the distinction between torts resulting in monetary gain to the tortfeasor and torts not resulting in such gain is an ancient one not unique to Kansas. The encyclopedists note the existence of this distinction both in the area of assignment of causes of action, 6A C.J.S. *Assignments* §§ 39–40, and the closely related area of survival. 1 Am. Jur.2d *Abatement, Survival and Revival*, §§ 71–72.

 It is therefore the law in Kansas that a tort claim for fraud resulting in benefit to the tortfeasor such as the one contained in the shareholder derivative action involved in this case is assignable. The cause of action may be included in the sale of the assets of this corporation.

## Are Punitive Damages Recoverable in Actions at Equity in Kansas

Traditionally, punitive damages were not awarded in actions at equity. *Newton v. Hornblower, Inc.*, 224 Kan. 506, 582 P.2d 1136 (1978); Annot. 48 A.L.R.2d 947 (1956). The modern trend, however, has been to allow punitive damages in actions at equity although such awards still constitute a minority view, see Annot. 48 A.L.R.2d 947, 949 (1956). The Kansas case of *Capitol Federal Savings & Loan Assn. v. Hohman*, 9 Kan.App.2d 217, 675 P.2d 384 (1984), aff'd. 235 Kan. 815, 682 P.2d 1309, (1984) allows punitive damages without actual damages as an equitable remedy though not necessarily in an action at equity. At least one jurisdiction has allowed punitive damages to be awarded in stockholder derivative actions. *Charles v. Epperson*, 258 Iowa 409, 137 N.W.2d 605 (1965); *Holden v. Construction Machinery Co.*, 202 N.W.2d 348 (Iowa, 1972).

It appears that where the facts in a particular case are found to be egregious an award of punitive damages will be considered against the offender whether the case sounds in law or in equity. This position is as likely in Kansas as elsewhere.

Assuming punitive damages might be awarded in Kansas, what effect would or should this have on the decision regarding the proposed sale? If the debtor were viable and not in dire need of operating capital, the possibility of an award of punitive damages would have considerable bearing on the wisdom of the proposed sale. In fact, if the debtor were not in immediate need of operating capital and if there were a possibility of an award of

punitive damages against the prospective purchaser, such a sale would not be in the best interests of the corporation. The facts, however, are that the debtor is not viable without an infusion of capital. The stockholder derivative action is pending with no guarantee that it will be soon concluded to the monetary advantage of the debtor. The preliminary ruling adverse to the prospective purchaser is on appeal and has been for at least one year without resolution. The exact amount of actual damages claimed is unclear but appears to range from $421,000 to approximately $600,000. A trial of the action may occur early next year but any prediction of outcome, award, or collectability of judgment is pure speculation and conjecture at this point. What is known is that a television station which the FCC found to be needed by the community and its 30 or so employees require a reliable source of funding to underwrite the nearly $100,000 per month shortfall of revenues being suffered. Without such a source all parties admit the station cannot survive. The only such source who has stepped forward in the year that the debtor has been in chapter 11 has been and continues to be the prospective purchaser, Larry D. Hudson. The creditors appear to be willing to allow Larry D. Hudson to take over the assets and assume the pre-chapter 11 obligations of the debtor and he is willing and able to do so as well as pay the administrative expenses of the chapter 11.

■ It is therefore concluded that despite the fact that Larry D. Hudson is a defendant in the stockholder derivative action, to deny sale to him of all corporate assets, including the derivative action, would be, as admitted by all parties, to cut off the debtor's source of funds, to take it off the air, lay off its employees and place it into chapter 7. This course of action would allow continuation of the stockholder derivative suit for the benefit of creditors of the defunct corporation. Before any stockholder would receive funds from the chapter 7 estate, however, a two million dollar gap between assets and liabilities would have to be made up from actual recovery in the lawsuit and there would have to be no diminution of asset value suffered in the liquidation proceeding. A very unlikely scenario. In contrast the proposed sale would result in continued operation of the primary asset of the debtor, continued employment of its personnel, probable payment of creditors and continuation of the stockholders' personal actions against Larry D. Hudson. From a purely practical standpoint, it would appear that sale is the event most likely to realize benefits for all parties and that failure to sell is most likely to result in losses for all parties.

### Should a Stockholder's Post Chapter 11 Capital Contribution be Treated as a Loan Entitled to Administrative Priority

■ Equity security holders Coe, Thompson, Earley, Tharp and Cale Hudson argue that they are entitled to have their post filing chapter 11 capital contribution treated as priority administrative expense claims pursuant to § 503(b)(3)(D) and § 507(a)(1) of title 11.

Section 503(b)(3)(D) states:

(b) After notice and a hearing, there shall be allowed, administrative expenses, other than claims allowed under section 502(f) of this title, including—

\* \* \* \* \* \*

(3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection incurred by—

\* \* \* \* \* \*

(D) a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 if this title, in making a substantial contribution in a case under chapter 9 or 11 of this title;....

Section 507(a)(1) states:

(a) The following expenses and claims have priority in the following order:

(1) First, administrative expenses allowed under section 503(b) of this title, and any fees and charges assessed against the estate under chapter 123 of title 28 . . . .

In order to understand what occurred in this case one must look at the facts and circumstances surrounding the stock offerings. The debtor's stockholders and board of directors were locked in mortal combat upon the debtor's entry into chapter 11. This combat has continued to this day. No outside source of funding was available to the debtor during the chapter 11 and only one insider was willing or able to make loans to the corporation pursuant to § 364 of title 11, the operable statute for obtaining credit and granting of administrative priority expense claims. That party, Larry D. Hudson, also invested in the additional stock issues that are the basis for the objecting equity security holders' claim, but he makes no claim for administrative priority for that investment.

The details of the stock offerings are set out above. Here it is sufficient to point out that no party was forced to purchase stock. Also, any party could have agreed to loan the debtor money under § 364 rather than purchase additional shares in a corporation with a substantially negative asset to liability ratio. Yet, other than Larry D. Hudson, no party at any time during the proceedings offered to make actual personal loans as opposed to equity investment. The stockholders now asking to be treated as though a loan had been made under § 364 were unable or unwilling to make such loans during the proceeding. It appears that they preferred to gamble on the ultimate success of their lawsuits and thus on their ultimate ability to control the corporation, rather than on the corporation's ability to repay administrative claims. Their unwillingness was due to the fact that there appeared to be no unencumbered asset substantial enough to accomplish such repayment and furthermore, such repayment would include all administrative claims and not only theirs.

Presumably, Larry D. Hudson agreed to the "control block" stock offering of April, 1984 in order to resolve the issue of control. The other parties agreed because they thought that by the date of the sale, the last of April, the state court litigation would have been concluded in their favor and they as parties in control of the corporation could seek discontinuance of the sale. The belief that the state court action would be concluded was overly optimistic; the suit was continued and is now scheduled to be heard in the first quarter of 1985. Again the objecting security holders gambled and lost.

The Court finds that each party had the opportunity to offer loans to or seek loans for the corporation prior to consideration of any stock sale; no loans were forthcoming; each party agreed that a stock sale was the only feasible method of raising funds needed by the corporation; no party was required to bid on the stock and in fact the moving parties did not bid at the second stock offering.

On the basis of the evidence before the Court consisting of the hearings and pleadings pertinent to the issue, the Court concludes that the capital infusion was risk capital and was not intended as a loan to the corporation.

IT IS THEREFORE ORDERED that the trustee's application to sell all of the assets of the debtor under the terms and conditions of the offer and acceptance by and between the trustee and Larry D. Hudson is hereby approved.