W. S. ANDERSON, as Stockholder of J. J. DUNNEGAN CONSTRUCTION COMPANY, Appellant, v. ELLA DUNNEGAN, Executrix, et al., Appellees; J. R. McDANIEL, Intervenor, Appellant.

J. J. DUNNEGAN CONSTRUCTION COMPANY, ex rel. W. S. ANDERSON, Claimant, Appellant, v. ELLA DUNNEGAN, Executrix, . Defendant, Appellee.

Nos. 41488, 41666, 41667.

SEPTEMBER 26, 1933.

REHEARING DENIED APRIL 5, 1934.

Carr, Cox, Evans & Riley, and Stipe, Davidson & Davidson, for appellants.

Stephens & Thornell, and C. R. Barnes, for appellees.

CLAUSSEN, J.—In the beginning, a suit was commenced in equity by W. S. Anderson, a stockholder of the J. J. Dunnegan Construction Company, against the executrix of the will of J. J. Dunnegan, and said construction company to recover, in behalf of the corporation, moneys to which, it was claimed, the construction company was entitled, and for which it refused to sue. In a petition of intervention, the intervenor, McDaniel, alleges that he is a stockholder in the construction company, and adopts the allegations of the petition of plaintiff. A claim was filed by W. S. Anderson for the construction company against the estate of J. J. Dunnegan. The suit in equity and the claim in probate were consolidated and tried together and are submitted in this case upon a single record. The appeals have been docketed in the office of the clerk of this court under Nos. 41488, 41666, and 41667, and are all disposed of in this opinion.

The amount involved in these actions is large; the pleadings are voluminous, embracing nearly 200 pages of the record, and a great mass of evidence was taken upon the trial, which when abstracted has produced a record of over 250 pages in addition to the exhibits which have been certified to this court. In consequence of this we can do little more than state our conclusions concerning the proper disposition of the appeals.

Prior to the year 1919, J. J. Dunnegan had been engaged in the construction of public works on a small scale. Dunnegan was not able to finance large jobs, and for the purpose of creating an organization capable of handling larger work Dunnegan cast about for associates who could supply credit. In that year a partnership was organized by him under the name of Dunnegan & Company, consisting of himself, E. S. Welsh, R. G. Berry, A. W. Murphy, E. A. Read, and E. H. Mitchell. In 1921 Mitchell sold his interest to appellant Anderson, and a new partnership was formed with Anderson as a member in the place of Mitchell under the name of J. J. Dunne-

gan Construction Company; the partnership contract reciting that the former partnership was continued with Anderson as a partner in the stead of Mitchell. On March 6, 1925, a Delaware corporation was organized by the members of the last-named partnership under the name of J. J. Dunnegan Construction Company. In view of the contentions of the parties, we will only say that substantially all, if not all, of the property of the partnership was taken over by the corporation and 3,000 shares of its stock were issued in blocks of 500 shares to each of the six partners.

In 1924, while the organization was still a partnership, the J. J. Dunnegan Construction Company bid on a large job in the city of St. Louis, which is referred to as the River des Peres job. It was not awarded the contract. The successful bidder failed in the performance of the work, and ultimately a proposition was made to Mr. Dunnegan by the officers of the city that the work be performed under a plan by which a percentage was paid beyond the actual cost, with a guaranty to the city that the cost would not exceed the amount of the bid. In December of 1924 Dunnegan signed a contract on that basis for the construction of a section of the improvement, between the city of St. Louis and the J. J. Dunnegan Construction Company. Attention is directed to the fact that the contract was entered into in the name of the construction company, because that fact is given great significance by appellants. Later on another contract was entered into by Mr. Dunnegan with the city of St. Louis for the construction of another section of work of the improvement, which also ran to the construction company. Both of these contracts were performed and a substantial profit was earned, due to the fact that by means of the second contract allowances were made for cleaning out silt and debris deposited by storms on the work undertaken in the first contract. About the time of the execution of the first contract Dunnegan discussed the proposition with three, and in all probability four, of his partners, each of whom questioned the advisability of taking the contract on account of the water hazard attending the work, and Dunnegan told each of them that he would take the work for Dunnegan & Briggs. Regardless of whether such discussions occurred prior or subsequent to the execution of the first contract, the contract was made in the name of J. J. Dunnegan Construction Company, and the record suggests, if it does not establish, that the second contract was made in the name of the construction company so that payment could be made under it for work which was neces-

sarily incident to the construction of the work covered by the first contract and for which no payment could be made under the first contract. The work under both contracts was done by the Dunnegan & Briggs organization. At the time work was commenced, or very shortly thereafter, Dunnegan ordered a drag line dredge, a concrete mixer, and certain batch boxes belonging to the construction company, and a pump, owned by Dunnegan & Briggs and the construction company, sent on the work, and they were duly shipped and used on the work. At about the time work was commenced, Dunnegan drew a check on the construction company's account in a Chicago bank, payable to the First National Bank of St. Louis, and deposited this check in the name of the construction company in the First National Bank of St. Louis, and later on he drew and deposited another check in the same manner. The total amount of such checks was $11,000. Payments made for work done under the contracts were deposited in this account in the First National Bank of St. Louis and checks were drawn on the account as the work progressed. While the work was without question done by the Dunnegan & Briggs organization, the account was carried in the name of the J. J. Dunnegan Construction Company. It has been noted that the performance of both contracts resulted in a profit, and, without dispute, none of such profit was ever distributed through the construction company either as a partnership or corporation.

These actions seek to recover such profits for the corporation. It is contended by appellants that the corporation is entitled to such profits on account of the following facts:

1. The contract was made in the name of the J. J. Dunnegan Construction Company, and while the company was a partnership when the first contract was made, upon the organization of the corporation it took over all the property of the partnership and consequently became the owner of the contract.

2. The work was financed with construction company's money.

3. The work was done with construction company's machinery.

It will be well to consider the second and third claims of appellants before proceeding to the discussion of the first. As before stated the River des Peres work was done by the Dunnegan & Briggs organization. When the work was begun the construction company owed Dunnegan & Briggs over $40,000. The checks totaling $11,000, with which this work was carried on, were credited on the books of the construction company on its debt to Dunnegan & Briggs. Con-

cerning the power of J. J. Dunnegan to draw the checks, as he did, for application on the account of Dunnegan & Briggs, the record leaves no question. The contention that the River des Peres work was financed by construction company's money is conclusively negatived by the record. Concerning the contention that the work was done with construction company's machinery, the situation is this: In the first instance a dredge, a mixer, and certain batch boxes, owned by the construction company, and a pump, owned in equal shares by the company and Dunnegan & Briggs, were installed on the job. This machinery was purchased by Dunnegan & Briggs and paid for. There is nothing in the record to cast suspicion on the bona fides of the purchase. The sale of equipment among the organizations seems to have been a very common thing. Appellant Anderson purchased equipment from the company, and the record discloses other sales of machinery back and forth. The price at which the property was purchased was the subject of discussion between the parties, and the record indicates that the prices paid were approved by appellant Anderson; this is certainly true concerning the batch boxes and the mixer. There is no evidence concerning the value of the machinery purchased. In this situation there is no merit in the contention that the machinery used on the job was construction company's machinery.

Adverting now to the circumstance that the contract was executed in the name of the construction company, it becomes necessary to consider appellants' claim that Dunnegan occupied a fiduciary relationship to them as partners and stockholders, in consequence of which he was not at liberty to divert the work from the construction company to Dunnegan & Briggs. Without particular attention to refinement in meaning, it may be conceded that a partner occupies a position of trust so far as the business of the partnership is concerned, and that a fiduciary relationship exists between partners. Such concession does not aid in the determination of this case. The work in question was undertaken while the company was a partnership; it was completed after the organization of the corporation. The concession in regard to the character of the relationship of the parties does not aid in the solution of this case for the reason that, subject to the rights of third persons and the restraints of statutory law and general public policy, partners may create such relations between themselves as they see fit. The relations between J. J. Dunnegan and his partners were unusual. At the time of the

organization of the partnership none of the individuals taken in by Dunnegan contributed any money or property to the partnership. When Anderson became a member of the organization he contributed nothing to the capital of the partnership, although he did buy out Mitchell's interest and assumed his liability for a deficit. The agreement drawn up at the time Anderson came in recites that the partnership is continued with Anderson as a member in lieu of Mitchell. During the existence of the original partnership Dunnegan continued his association with others in contract work. When Anderson came in, the matter of Dunnegan's salary was discussed by the partners, Anderson being present, and by specific oral agreement of the partners Dunnegan was permitted to continue his relations with others in construction works, and such relations were continued openly and with the knowledge and without objection on the part of any partner. In annual reports appellant Anderson suggested the advisability of disbanding the other organizations and taking the keymen into the construction company organization on a profit-sharing basis, but his representations never extended beyond recommendations that this be done. On a number of projects the construction company was associated with another Dunnegan organization in the execution of the work. It is quite evident from the record as a whole that Dunnegan had a peculiar genius for procuring work and that he procured work for the various organizations during all the years of the existence of the construction company either as a partnership or a corporation, with the knowledge and approval of his associates. We may be permitted to suggest that such approval may have been induced by recognition, on the part of the associates, of the great ability of Dunnegan and to have been bottomed on the belief that objection on their part would have meant that Dunnegan would have left their organization. In any event, there is no doubt concerning the power which was actually his. He distributed the work as his judgment dictated. In signing the contract for the River des Peres work in the name of the construction company and having the work done by Dunnegan & Briggs, Dunnegan was not exceeding his power. He was using a power that was his. It is true that such power is not incident to the relations existing between partners, or a partner and a partnership. The possession of this power by Dunnegan was due to the fact that it had been conceded to him by his associates. It has been suggested that these concessions were made as a necessary cost of retaining J. J. Dunne-

gan in the organization. The wisdom displayed by the associates in making the concession is demonstrated by the fact that the construction company quite uniformly earned large sums of money, and went out of business when Dunnegan's health no longer permitted him to be active in the affairs of the company. It is undoubtedly true that the partners could have prevented Dunnegan from acquiring such power and could have stripped him of it at their pleasure. These things were never done, and of necessity the validity of Dunnegan's acts in relation to the River des Peres work must be determined in the light of the power actually had by him. The record convinces us that at about the time the contract for this work was signed Dunnegan discussed the work with all of his associates except Anderson, and that each one rather dissented against the work being undertaken. To each Dunnegan stated that he would take the work for Dunnegan & Briggs. Whether he meant by this that he would take the contract for Dunnegan & Briggs, or would take the work off the hands of the company for Dunnegan & Briggs, we have no way of knowing, in view of the fact that the record leaves doubt as to whether the conversations were before or after the contract had been signed. In any event, if the conversations took place after the contract had been signed, Dunnegan was in a position in which he could take the work off of the company's hands for his other organization. And if this is what was done, it was done with the assent of four of the five other partners.

So far as appellant Anderson is concerned, he testified that he aided in the preparation of the unsuccessful proposal for the River des Peres work in the name of the J. J. Dunnegan Construction Company. He knew that Dunnegan secured the work; that the Dunnegan & Briggs organization was doing the work; and that none of the profits of the work came into the construction company coffers. He was in St. Louis and saw the construction company machines on the job. He undoubtedly knew of the terms of the sale of the machinery to Dunnegan & Briggs. It is true that he stated that he first learned that the actual contract for the work was in the name of the construction company when he attended Dunnegan's funeral. He was active in the management of the affairs of the company. The record discloses extended annual reports made by him, in which he displays what seems to be comprehensive knowledge of the affairs of the company and the Dunnegan organizations. He made no ob-

jections and did nothing until after Dunnegan was dead. He has no special equities.

The extent of Dunnegan's powers in the partnership and the corporation are disclosed by the testimony of surviving partners. Appellant seeks to cast doubt upon their testimony by showing that some of them had executed a guaranty to Mrs. Dunnegan against loss through the outcome of these actions. The testimony of the witnesses, even in the light of their interest under such contract, is convincing on the question of the relations between Dunnegan and the company and his power, and is sustained by other facts and circumstances.

Appellant seeks to show a motive for wrongdoing on the part of Dunnegan in giving this work to Dunnegan & Briggs, and to cast doubt on the testimony of some witnesses by proof of the fact that one Gilmore, who acted as superintendent on the work, was indebted in a large amount to a bank in Shenandoah, Iowa, in which Dunnegan and such witnesses were officers; that the payment of such indebtedness was guaranteed by Dunnegan and such witnesses; and that finally such indebtedness was paid by Gilmore out of his profits on the work. The inference which appellants want drawn from these facts is that Dunnegan threw the job to Dunnegan & Briggs, so that Gilmore could pay his debt to the bank, and that the witnesses had a similar interest in the matter on account of their obligation on the guaranty and as officers of the bank. These facts have been given consideration and proper weight in reaching the conclusion hereinbefore expressed.

It will be remembered that one E. A. Read was an original partner. He and Dunnegan were interested together in many other ventures. Ultimately a settlement of such other ventures became necessary. In the negotiations between Read and Dunnegan, Read claimed and Dunnegan denied that Read was entitled to a portion of the profit on the River des Peres job. Ultimately a credit was allowed Read on that account, and with such credit it was still found that Read owed Dunnegan $33,000. It is contended that this is a recognition of the rights of the associates in the company to the profits. It is a circumstance to be considered, but in the light of the picture of Dunnegan painted by the record, the concession by him to an old associate becomes merely another example of his generosity to his old friends rather than evidence of corruption in the River des Peres contract.

After the organization of the corporation a second contract was made by Dunnegan with the city of St. Louis for the construction of section B-1 of the River des Peres improvement. This contract was made in the name of the J. J. Dunnegan Construction Company. We gather from the record that the only purpose of the execution of the second contract was to create a situation in which payment could be made for the removal of debris and items of water damage to work on the first section, which were reflecting a loss on the work of the first section. The execution of the contract in the name of the construction company was an expedient by which a loss on the first section was recouped out of the second. The execution of the second contract was incidental to the execution of the work under the first contract, and disposition of claims based on it must follow that indicated for claims based on the first contract.

Appellants contend that in the discussions of the River des Peres work with his associates Dunnegan did not fully disclose the truth nor accurately portray the situation. We have carefully examined the record in the light of these contentions, but are unable to reach the conclusion that the associates were deceived as to the situation. The fact is that the work was extrahazardous, and that loss was only averted through the expedient of the second contract.

The fact that the account out of which this work was constructed was carried in the First National Bank of St. Louis in the name of the J. J. Dunnegan Construction Company is not a controlling circumstance. The record indicates that all money derived from sources other than the work was money rightfully paid and charged to Dunnegan & Briggs. The work was done by Dunnegan & Briggs, and funds paid out in doing such work belonged to Dunnegan & Briggs. The work was financed with Dunnegan & Briggs' money, even though the account was carried in the name of J. J. Dunnegan Construction Company.

It is contended that certain machinery purchased for use on the River des Peres work was paid for by construction company's money, and that the company is entitled to the proceeds of its sale. Initial payments on such machinery were paid out of J. J. Dunnegan Company's account in a Chicago bank, but such payments were charged to the account of Dunnegan & Briggs, to which firm the construction company was then indebted. The remainder of the purchase price was paid out of the funds in the First National Bank

of St. Louis, which we have indicated were Dunnegan & Briggs' money. Such machinery was neither bought nor paid for by the construction company, and consequently it is not entitled to the proceeds of the sale.

In 1926 J. J. Dunnegan personally entered into a contract with the city of Maplewood, Missouri, a city near St. Louis, for the construction of a sewer. It seems that Dunnegan really took the job to provide employment for a former associate named Corey. Dunnegan and Berry borrowed $50,000 from the First National Bank of St. Louis for the purpose of financing this work. The work was done by Mr. Corey, and no equipment or machinery of the construction company was used on the work. Appellant's claim to a share of the profits on the job is based principally on the fact that when the notes for $50,000 signed by Dunnegan and Berry were paid, payment was made out of the account of the River des Peres work carried in the First National Bank of St. Louis in the name of the construction company. We have noticed that such account was made up of funds charged to Dunnegan & Briggs and sums paid for work done by Dunnegan & Briggs, and have found that such funds were not the property of the construction company even though the account was carried in its name. Another contention is, in effect, that Dunnegan was not at liberty, by reason of his connection with the construction company, to take this work. This claim will have attention further on.

Dunnegan also personally entered into a contract with the city of St. Louis for the construction of a concrete bridge over the River des Peres on Southwest avenue. This work was carried on simultaneously with the River des Peres work and was financed out of the account in the First National Bank of St. Louis, to which reference has been made in preceding paragraphs. The claims of appellants in relation to the profits of this job are based on substantially the same grounds as their claims to profits on the Maplewood sewer.

In the year 1927 the construction company secured a contract for the construction of a large sewer in South Bend, Indiana. Shortly before the completion of this work J. J. Dunnegan signed a contract personally for the construction of a sewer that emptied into the one under construction by the company. Two checks were drawn by Dunnegan payable to himself on funds of the construction company in the Chicago bank and deposited in his name in

a South Bend bank. Out of such funds Dunnegan financed the construction of the sewer. Some complaint is made by appellants concerning the way the second of said checks was charged on the books of the construction company, but we are satisfied that the amounts of the checks were properly drawn by Dunnegan, and were in no sense a misappropriation of company funds. The work was supervised by an associate, a Mr. Gilmore, who was during the time on the company payroll at a relatively small salary. Many of the employees engaged in the construction of the work were transferred from the company's pay roll. There is no claim made that the company's work suffered in any way on account of the attention given to the work by the superintendent or the transfer of the employees. It is contended that Dunnegan was an officer of the corporation, that the sewer built by him was an extension of the large sewer built by the corporation, and that it was Dunnegan's duty as an officer of the corporation to take the job for the corporation, and that he was not at liberty to take it for himself.

We have discussed the powers had by Dunnegan under the relations existing between him and his associates, while the construction company was a partnership. But the second River des Peres contract, the Southwest avenue bridge, the Maplewood sewer, and the South Bend sewer contracts were entered into after the construction company had been organized as a corporation.

Counsel for appellants cite, as authority to sustain their claims to the profits on these jobs, cases in which the relations between the officer and the corporation were not such as existed between Dunnegan and the corporation and his associates. An individual may put such price upon his services as he sees fit. It is optional with the other parties whether they will pay the price. A part of the price of Dunnegan's services to the corporation was his liberty to engage in contract work, alone and in connection with others. He retained this liberty when the partnership was formed. When the corporation was formed there was no change in the relations of the parties or in the management of the business, or in Dunnegan's activities. Dunnegan exercised his rights to contract outside the corporation, and his associates conceded his rights in that respect. As has been suggested in connection with partnership matters, Dunnegan's services probably would not have been available if the corporation or his associates had attempted to circumscribe his activities to the limits of the corporation. Without in any man-

ner limiting the effect of the salutary rules of law that require loyalty and singleness of purpose on the part of officers of a corporation in the management of corporate affairs, it can and it must be conceded that an individual may make the reservation of personal rights in himself a condition to becoming an officer of a corporation. Those interested in the corporation are under no legal compulsion to concede such rights. But if such rights are conceded it is elementary that no complaint in behalf of the corporation can be made because the conceded rights are exercised. In the exercise of the conceded rights the officer violates no duty. Dating back to the time of the first association of these men, and seemingly at all times since, Dunnegan was engaged in contract work outside the construction company, not in a furtive or covert manner, but openly and with the knowledge and actual assent of his associates. The things which Dunnegan did in relation to the second section of the River des Peres work, the Southwest avenue bridge, the Maplewood sewer and the South Bend sewer, were not in violation of his duty to the corporation because they were done pursuant to conceded rights. It requires undue credulity to believe that appellant Anderson did not know that Dunnegan both claimed and exercised such rights, or that Anderson did not concede such rights to Dunnegan. In this situation Anderson cannot complain, nor can he complain in behalf of the corporation for which he assumes to speak. The corporation itself does not complain. It has answered and filed a cross-petition in which it is stated, in effect, that the things done by Dunnegan were done in the exercise of powers that were his, and it disclaims any interest in the profits sought to be recovered in the petition. The equities in the situation are elementary and axiomatic. The result is that we have been cited no authority directly in point.

The intervener, McDaniel, in his petition of intervention merely adopts the allegations of Anderson's pleadings. He neither alleges nor proves any facts which give him any standing superior to Anderson. The record and arguments present many intricate questions which are entirely immaterial in view of the conclusions we have reached from a consideration of the evidence in relation to Dunnegan's powers. The trial court dismissed the petition and claim, and the petition of intervention. This action was undoubtedly correct. The decree of the trial court will be affirmed. A motion to strike appellee's second amendment to and correction of abstract

was submitted with the case. The motion is overruled.—Affirmed.

All Justices concur, except EVANS and STEVENS, JJ., who take no part.