(No. 46228, 46231 cons.—

THE VENDO COMPANY Appellant and Appellee, v. HARRY B. STONER *et al.,* Appellants and Appellees.

*Opinion filed Sept. 27, 1974.—Modified on denial of rehearing Nov. 27, 1974.*

Reid, Ochsenschlager, Murphy & Hupp, of Aurora, and Hillix, Brewer & Myers of Kansas City, Missouri (Lambert M. Ochsenschlager, John M. Lamont, Wayne F. Weiler, Albert F. Hillix, William C. Murphy, and Stephen J. Mrkvicka, of counsel), for The Vendo Company.

Barnabas F. Sears, James E. S. Baker and James N. Kosmond, all of Chicago (James A. Hardgrove, Thomas L. Brejcha, Jr., Boodell, Sears, Sugrue, Giambalvo & Crowley, and Sidley & Austin, of counsel), for Harry B. Stoner and Stoner Investments, Inc.

MR. JUSTICE SCHAEFER delivered the opinion of the court:

This appeal is the outgrowth of litigation which commenced in 1965 with the filing of a complaint in the circuit court of Kane County by plaintiff, The Vendo Company, against Harry B. Stoner and Stoner Investments, Inc., a company of which Stoner is the president and whose sole stockholders are Stoner and his wife.

The case was tried without a jury and resulted in a judgment against Stoner in the amount of $250,000 and a judgment against Stoner and Stoner Investments, Inc., of $1,100,000. An appeal was taken by defendants to the Appellate Court for the Second District, and that court reversed the judgment in part and remanded the cause for further hearings with respect to the amount of damages properly recoverable by the plaintiff. (*Vendo Co. v. Stoner* (1969), 105 Ill. App. 2d 261.) Plaintiff filed a petition for leave to appeal which was denied by this court.

Following the hearings on remand the circuit court entered a judgment against Stoner for $170,835 and a judgment against both defendants for $7,345,500. The case was again appealed to the appellate court by defendants. That court affirmed the judgment awarding damages against Stoner individually, but it reversed the judgment rendered against the two defendants jointly for

$7,345,500, and remanded the cause for additional hearings as to the amount of damages. (*Vendo Co. v. Stoner* (1973), 13 Ill. App. 3d 291.) Each party filed a petition for leave to appeal, and each petition was allowed.

The intricate and prolonged litigation now before us concerns the development and marketing of a new and successful type of candy-vending machine by a concern called Lektro-Vend, allegedly with the active support of each defendant, during the period when Stoner was an employee and a director of plaintiff. Before discussing the two decisions hitherto rendered and the contentions now made by the parties, it is necessary to review various events which took place in 1959 and thereafter.

In April of 1959 the defendant Harry B. Stoner was the president and the controlling owner of Stoner Manufacturing Corporation, an Illinois corporation with its principal place of business in Aurora, Illinois, and a predecessor of the corporate defendant here. Stoner Manufacturing Corporation had been engaged for many years in the business of making and selling candy-vending machines throughout the United States. The plaintiff, a Missouri corporation located in Kansas City, Missouri, was at that time engaged in the business of manufacturing and selling vending machines designed to handle beverages, ice cream, and various other products. It did not make a machine for vending candy, but at least as early as 1958 it had considered the possibility of making a candy-vending machine, and had undertaken some research into that matter.

In April, 1959, plaintiff and Stoner Manufacturing Corporation entered into a contract for the purchase by plaintiff of the assets of the corporation, including inventions, patents, drawings, designs, and research and development work. Plaintiff's purpose in making the acquisition was in part to add a candy-vending machine to its line. So far as Harry B. Stoner was concerned, the motive for the sale appears to have arisen from a concern

that the poor state of his health would prevent him from continuing in the active direction of his company.

Under the sale agreement plaintiff was to pay the Stoner Manufacturing Corporation $3,400,000 in cash and to deliver to it 60,000 shares of plaintiff's stock. The land and the property constituting the Stoner Manufacturing Corporation plant was leased to plaintiff at a stipulated rental for 10 years with an option of renewal for a like period. Plaintiff was also given an option to purchase the property on or after December 31, 1961.

Plaintiff agreed to pay annually, for a period of 10 years or until such time as it might exercise its option to purchase the plant, all profits in excess of $250,000 realized from the use of the assets being purchased. Any amount theretofore paid by plaintiff out of profits was to be credited upon the purchase of the plant. Plaintiff further agreed to pay, for a period of 10 years, 25% of the income received from foreign sales realized from the use of the assets being purchased.

The corporation agreed to use its best efforts to preserve its business organization intact, and to keep available to plaintiff the services of its present officers and employees.

The sales contract contained several restrictions on competition by the selling corporation. The contract specified:

> "From and after the closing, the Company [i.e., Stoner Manufacturing Corporation] will not own, directly or indirectly, manage, operate, join, control or participate in the ownership, management, operation or control of, or be connected in any manner with, any business engaged in the manufacture and sale of vending machines under any name similar to the Company's present name, and, for a period of ten (10) years after the closing, the Company will not in any manner, directly or indirectly, enter into or engage in the United States or any foreign country in which Vendo or any affiliate or subsidiary is so engaged, in the manufacture and sale of vending machines or any business similar to that now being conducted by the Company. The Company also agrees that during its

corporate existence it will, without incurring any financial obligation, co-operate with Vendo to prevent the use by others of the names 'Stoner' and 'Stoner Mfg. Corp.' in connection with any business similar to that now carried on by the Company and also agrees not to disclose to others, or make use of, directly or indirectly any formulae or process now owned or used by the Company."

On June 1, 1959, Stoner executed an employment contract with plaintiff. The contract recited plaintiff's desire to employ Stoner's services, and it stated that the value of his services consisted of his "advice and counsel in the operation of the Aurora, Illinois, facility, and his know-how, experience and reputation in the vending machine field."

A paragraph of the employment contract also contained a limitation on competition. It provided:

"5. During the term of this agreement and for a period of five (5) years following the termination of his employment hereunder, whether by lapse of time or by termination as hereinafter provided, Stoner shall not directly or indirectly, in any of the territories in which the Company [*i.e.*, the Vendo Company] or its subsidiaries or affiliates is at present conducting business and also in territories which Stoner knows the Company or its subsidiaries or affiliates intends to extend and carry on business by expansion of present activities, enter into or engage in the vending machine manufacturing business or any branch thereof, either as an individual on his own account, or as a partner or joint venturer, or as an employee, agent or salesman for any person, firm or corporation or as an officer or director of a corporation or otherwise, provided however that the Company, its subsidiaries and affiliates shall be excluded from the restrictions hereof and provided also that Stoner shall be permitted to own, hold, acquire and dispose of stocks and other securities which are traded in the investment security market whether on listed exchanges or over the counter."

The candy-vending machine which was being manufactured by Stoner Manufacturing Corporation at the time it sold its assets to plaintiff in 1959 was a model which is called a "drop shelf" machine in the jargon of the trade. The "Lektro-Vend" model subsequently developed by the

Lektro-Vend Company possessed three significant advantages over the drop-shelf model which made it popular and successful with companies, known as "operators," who purchase and service vending machines. The first of these advantages was that the machine could sell candy bars in the same order in which it had been stocked, a method called "FIFO," standing for first-in, first-out. The FIFO design produced savings to the operator by reducing the risk of having to vend or to discard stale items, and reducing the frequency of service calls to restock the machine. The second advantage of the Lektro-Vend model was that it permitted a continuous visible display of the item which was next to be vended. Thirdly, the Lektro-Vend employed a type of construction which permitted .more than one type of product to be stocked on a single conveyor, thus eliminating the need to exhaust one product line before replacing it with a second. While each of these traits had been in existence for some years, Lektro-Vend was the first to combine all of them in a single machine having a practical design.

As the result of research into the possibility of developing a vending machine of this character, plaintiff, in August, 1959, had built two developmental models, sketches of which were shown to Stoner. Representatives of plaintiff, while agreeing on the desirability of developing a machine with such capabilities, considered this particular prototype to be defective in certain mechanical respects and also as being too expensive to produce. The research project for the machine was accordingly shelved.

In mid-1960, two engineering employees of plaintiff, Rod Phillips and his son William, each of whom had been employed by the Stoner Manufacturing Corporation prior to the date of the sale of its assets to plaintiff, became dissatisfied with their job situation with plaintiff and resigned. At this time certain disagreements had developed between Stoner and plaintiff as to Stoner's role in plaintiff's operations, which Stoner considered should be

more than the merely advisory function to which plaintiff had, in his view, assigned him.

No evidence was introduced to show that Stoner played any part in inducing the resignation of either of these employees of plaintiff, but each of them approached Stoner after his resignation, and solicited his financial support in the design and development of certain devices. William Phillips, in mid-1960, induced Stoner to pay him a salary while he designed an electronic coin-detecting device. The machine, as the appellate court concluded, had no functional relation with the subsequent development of the Lektro-Vend vending machine, and consequently has no bearing on the claim made by plaintiff against defendants.

In late 1960 or early 1961, however, Rod Phillips approached Stoner with a request that Stoner provide financial support to cover the development of a vending machine, of the new type which has already been described, and Stoner agreed to do so. Stoner testified that the understanding was that Phillips would own the machine, if it were developed, and would be entitled to any profits earned from it. There is no confirmation of Stoner's testimony in this regard. Rod Phillips was not called as a witness because of a medical representation that his physical condition was unsatisfactory. While a stipulation was entered on the record as to what his testimony would have been had he appeared, the stipulated testimony did not refer to the prospective ownership of the machine.

Interest-free loans which aggregated some $200,000 were made to Phillips by Stoner Investments during 1961 and 1962. Some of these funds were used to buy equipment necessary for the engineering of the machine. Stoner also made available rent-free a building owned by him for use in conducting the development work. In 1961, when two more former employees of Stoner Construction Corporation, who had had experience in design and

toolmaking, resigned from employment with plaintiff, they joined Rod and William Phillips on the research and development project. They received monthly salaries aggregating $1,150 from Stoner Investments.

By October, 1962, the developmental work on the new machine had progressed to the point where a prototype could be exhibited at a trade show held in San Francisco. The model shown differed in many important respects from and was a major improvement upon the device which plaintiff had worked on in 1958 and 1959, and it won a very favorable reaction in the industry.

Following the trade show, which had been attended by several of plaintiff's personnel, and the return of Rod Phillips to Illinois, several important developments took place. Their sequence and the exact dates when they occurred are not made wholly clear by the evidence, but in main outline they can be summarized as follows.

Shortly before December 18, 1962, on which date plaintiff's board of directors was to meet, Stoner asked the chairman, Elmer Pierson, to be released from his employment contract, stating that he had an opportunity to invest in the manufacture and sale of the Lektro-Vend machine. Stoner did not disclose that he had already been giving support to the development of Lektro-Vend.

Plaintiff refused to release Stoner from his contract. A letter dated January 2, 1963, from Pierson explained the refusal in the following language:

> "I have always felt that one of the major advantages of the Stoner acquisition contract, from our standpoint, was the fact that it guaranteed that your design genius and experience would never be coupled with our money to put a new and most formidable competitor into the business against Vendo. I can assure you that nothing has happened in recent years to change our position on this matter in any way. I am sure you will understand."

Pierson went on to say that plaintiff itself had an interest in buying the Lektro-Vend. He asked Stoner to ascertain if Phillips had any interest in selling it, and if so,

to set up a meeting between Phillips and representatives of plaintiff. Stoner then wrote one of plaintiff's vice-presidents, Spencer Childers, that Phillips would be willing to sell if the price were high enough. Stoner told plaintiff that Phillips wanted $1,500,000, and that a third company had expressed a willingness to pay that amount.

A meeting did take place between Phillips and representatives of plaintiff in the latter part of January, 1963. The purpose of the meeting was to show plaintiff's representatives how the Lektro-Vend worked, and the record does not indicate that price was discussed. In March, Stoner informed plaintiff that he had told Phillips that he assumed, in the absence of further word from Childers, that plaintiff no longer had an interest in making the purchase. Childers wrote back on April 9 stating that plaintiff did still have such an interest, but that the asking price of $1,500,000 was too high. Plaintiff stated that it was, however, prepared to pay a lower price which would be enough to cover development costs and return a fair profit to Phillips and his associates. The record does not indicate whether this counteroffer was transmitted to Phillips. In any event Stoner testified that the "negotiations" between Phillips and plaintiff terminated at this time.

It must be added that the record casts some doubt on whether at this time Phillips seriously entertained any intention of selling the Lektro-Vend design at all, rather than going into the manufacture and sale of these machines himself. Mrs. Ruth Netrey, Stoner's sister-in-law, testified that back in December, 1962, Phillips had called her to request a loan to assist him in connection with the manufacture of a vending machine he was developing. Mrs. Netrey initially lent Phillips $350,000, which was later increased to $525,000, at an interest rate of 4½%. No payment was made on either principal or interest until September, 1963, at which time Mrs. Netrey received a note for the amount due her from the Lektro-Vend

Corporation, which had just been organized. The proceeds of the loan were used in part to pay off the loan due Stoner, as Mrs. Netrey and Stoner each knew. Stoner testified that his notes were repaid because he had to "withdraw his support" when Phillips wanted to go into manufacturing.

During 1963 Rod Phillips proceeded with his plans to set up a manufacturing operation, and in March or April Stoner Investments completed the construction of a building in Aurora which was made available to Phillips for this purpose.

Stoner had a further conversation with Pierson in the spring or summer of 1963, in which Pierson inquired as to the actual extent of Stoner's involvement with Phillips. Stoner told him that the relationship had been confined to loans and that these had since been repaid by another person. Stoner did not disclose that this other person was his sister-in-law. This conversation marked the first occasion on which Stoner disclosed any involvement with Lektro-Vend, and the disclosure was far from complete.

The Lektro-Vend Corporation was formed in September. Its original stockholders were Rod Phillips and William Phillips, certain other employees, and Mrs. Netrey, who held 50% of the stock. Neither Stoner personally nor Stoner Investments was a stockholder at that time.

In March, 1964, shortly before Stoner's contract with plaintiff was to lapse, Stoner Investments contracted to sell to Lektro-Vend the new plant which had been built by Stoner Investments during the previous year. The purchase was made with the proceeds of a bank loan which was advanced subject to an agreement by Stoner Investments to guarantee the repurchase of the property in the event of a default on the loan.

Stoner's contract of employment terminated June 1, 1964, and it was not renewed. Although the appellate court in its first opinion states that Stoner remained on the board of plaintiff until the spring of 1965, defendants

refer us to testimony by Stoner that he ceased being a director in March or April of 1964, and that testimony was corroborated by testimony of plaintiff's secretary.

On June 10, 1964, Lektro-Vend issued 5,000 shares of stock to Mrs. Stoner, and on July 15 it issued 5,000 shares of stock to Stoner Investments. In the years of 1965 and 1966, loans exceeding $350,000 were made to Lektro-Vend by Stoner Investments or another company controlled by Stoner.

In March, 1965, Stoner sent a letter to 50 vending-machine operators in which he identified himself as the longtime former president of the old Stoner Manufacturing Corporation, and stated that he was now interested in Lektro-Vend. The letter contained the following passage:

"I believe that I can lay claim to having personally initiated the design and production of more vending machines still in use than any other one man in the history of vending. I believe that vending machines of my design still in use are making operators better than a million dollars a week right now and I am willing to risk my reputation as a vending machine designer and manufacturer to say that the LEKTRO-VEND products will set new highs in earnings to operators and will be the standard of comparison for the next 50 years."

The letter was plainly intended not only to associate Lektro-Vend with Stoner, but to convey to a reader the impression that Lektro-Vend would receive the benefits of the skill and reputation which Stoner had enjoyed as the head of Stoner Manufacturing Corporation.

Plaintiff's original complaint contained two counts, the first directed against Stoner individually and the second against Stoner Investments. Each count alleged a breach of the covenants not to compete contained in the sales and employment contracts, and each sought recovery in the amount of $500,000. Plaintiff subsequently amended each count to include additional allegations seeking recovery for the theft of a trade secret, a claim predicated on Stoner's having seen in 1959 the sketches of the

prototype developed by plaintiff. The amount of the *ad damnum* was also raised to $1,500,000 on each count, and later to $7,000,000.

As previously noted, the trial court entered a judgment against Stoner individually for $250,000 and a judgment against Stoner and Stoner Investments jointly for $1,100,000. As viewed by the appellate court in its first opinion the first judgment was intended to represent a forfeiture of Stoner's salary during a 4-year period during which his breach of duty was occurring. The larger sum represented the damages allowable on the trade-secret theory, calculated on the basis of the $1,500,000 which Stoner had said Lektro-Vend was worth in 1962, less $400,000 for the estimated costs of developing it.

The appellate court rejected the claim based on the theft of a trade secret, on the grounds that in 1959 plaintiff was in possession only of an idea or a goal which had not been reduced to a specific means of accomplishment, that any disclosure to Stoner had been incomplete, and that the substantial differences between the plaintiff's prototype and the Lektro-Vend made it unlikely that the knowledge of the former could have contributed to the development of Lektro-Vend. The appellate court did hold, however, that plaintiff was entitled to damages over and above the $250,000 to the extent that there were lost profits which were attributable to the breach of the covenants and diminution of its business, and the court remanded the cause to the circuit court for further evidence on this issue.

The principal issue which now divides the parties is whether the trial court on the remanded hearing measured damages according to the proper standard. Plaintiff makes the claim, which the trial court accepted, that plaintiff is entitled to a sum equal to what its profits would have been had plaintiff been the owner of Lektro-Vend. Defendants maintain plaintiff can recover only those lost profits attributable to the fact that the products which plaintiff

did in fact make and sell had to compete with the Lektro-Vend machine. The latter figure, each party appears to assume, would be much smaller than the former, for it would be necessary to exclude from it any losses attributable to other causes, such as competition from companies other than Lektro-Vend, the inferiority of plaintiff's drop-shelf machines as compared to the Lektro-Vend, and the fact that the market for candy-vending machines contains several submarkets, some of which were not served by both plaintiff and Lektro-Vend to the same extent.

Quite apart from any liability which may be predicated upon a breach of the covenants against competition contained in the sales agreement and the employment contract, it is clear that Stoner violated his fiduciary duties to plaintiff during the period when he was a director and an officer of plaintiff. Beginning in 1960 or 1961 and continuing up until just before he ceased to be employed by plaintiff he contributed substantial financial support, either directly or through Stoner Investments, Inc., to the development of a superior machine which would be competitive with the older and less satisfactory model produced by plaintiff. Stoner testified that up until a date shortly before the Lektro-Vend was publicly exhibited he did not see the models, and Phillips's testimony confirms this. Stoner also testified that until that time he did not even know that Phillips was working on such a machine. This latter testimony, however, was contradicted both by testimony given by Stoner on his deposition and by Phillips. In view of the substantial amounts which he was spending on Phillips's research project, moreover, Stoner's testimony that he never inquired as to Phillips's activities or visited the plant to inspect the work in progress is highly implausible. We conclude, as the trial court must have concluded, that Stoner was fully aware of the nature of the device which was being developed and also of its competitive potential. Indeed, Stoner himself testified that

when he first observed the finished Lektro-Vend he called it "the vending machine of the future," and predicted that it would render other models obsolete.

Stoner was hired by plaintiff on the basis of the skill and experience which he could bring to plaintiff. Defendants contend that plaintiff did not take advantage of Stoner's talents and gave him the role of a mere figurehead. Assuming that plaintiff, whether prudently or imprudently, failed to make the best use of Stoner's abilities, such a failure certainly did not release Stoner from his duty not to assume a position which would be adverse to that of his employer.

In addition to his prior and subsequent support of Phillips's development of Lektro-Vend, Stoner's actions in respect to plaintiff's unsuccessful attempts in late 1962 and early 1963 to purchase the design violated his fiduciary obligations. In view of Stoner's prior expression of a desire to leave plaintiff's employment so that he could become associated with Phillips, it was perhaps naive of plaintiff to assign Stoner himself as its intermediary. Had he disclosed the extent of his financial involvement in the Lektro-Vend, it may be doubted whether plaintiff would have done so, rather than dealing with Phillips directly or through some other agent.

Stoner had a foot in each camp. Not only did his undisclosed individual interest in controlling the further development and ultimately the manufacture and sale of the Lektro-Vend create the possibility of his taking an unfair advantage of plaintiff, but the evidence gives strong indication that he actually misled plaintiff while he was purportedly acting as plaintiff's agent with regard to plaintiff's possible acquisition of the Lektro-Vend. The information given plaintiff that Phillips wanted a price of $1,500,000 for the Lektro-Vend came only from Stoner. Whether Phillips might have been willing to sell at a lower figure acceptable to plaintiff is unknown.

We recently had occasion in *Kerrigan v. Unity Savings Association* (1974), 58 Ill.2d 20, to consider the ob-

ligation upon a director or officer to make full disclosure to his corporation. In that case, involving the appropriation of a business opportunity, the defense was made that the plaintiff, a savings and loan association, lacked the legal power to engage in the business which defendants were carrying on, which was the operation of an insurance agency. We rejected that defense for the reason that the association had never been given the opportunity to decide that question for itself. We said:

"*** if the doctrine of business opportunity is to possess any vitality, the corporation or association must be given the opportunity to decide, upon full disclosure of the pertinent facts, whether it wishes to enter into a business that is reasonably incident to its present or prospective operations. If directors fail to make such a disclosure and to tender the opportunity, the prophylactic purpose of the rule imposing a fiduciary obligation requires that the directors be foreclosed from exploiting that opportunity on their own behalf." 58 Ill.2d at 28.

See also the discussion of the fiduciary duties of officers and directors by the appellate court in *Paulman v. Kritzer* (1966), 74 Ill. App. 2d 284, 289-295, which was specifically endorsed by this court in our affirmance of that decision. *Paulman v. Kritzer* (1967), 38 Ill.2d 101, 104; *cf. Lerk v. McCabe* (1932), 349 Ill. 348, 360-362; Restatement (Second) of Agency secs. 387, 389, 391, 393, 394 (1958).

Plaintiff was not, as defendants urge, limited to the recovery of the profits which accrued to Lektro-Vend. (See Restatement (Second) of Agency secs. 399, 401, 407 (1958).) The limitation on a plaintiff's recovery proposed by defendants would mean that a fiduciary could violate his duty without incurring any risk. For if his misconduct were discovered the most that he could lose would be the profit gained from his illegal venture; the law would have

operated only to restore him to the same position he would have been in had he faithfully performed his duties.

Defendants repeatedly state that the failure of plaintiff to develop a FIFO-type machine showed a lack of interest on its part. We have reviewed the testimony and we conclude that plaintiff did have and retained an interest in having such a machine. Its failure to develop one itself initially rested on problems in the design of the particular model which had been developed. The instances in which plaintiff, after 1962, failed to develop such a machine seem in part to be explained by a concern that several other companies had by then developed similar machines and that it might be too late for plaintiff to successfully enter the market. We are not called on here to review the business prudence of plaintiff's decisions, however, and we cannot say that plaintiff would have declined an offer to purchase the Lektro-Vend, with its advanced technology, or to seek to develop such a machine itself had a genuine opportunity to do so been extended to it.

Defendants assert that the evidence introduced by plaintiff on the remand and the theory on which it was offered did not comport with the law of the case as established by the first opinion of the appellate court nor with the court's mandate. Plaintiff disputes defendants' interpretation of the first opinion of the appellate court. We need not consider this point, however, since the doctrine of the law of the case is not applicable to this court in reviewing the judgment of the appellate court. *Sjostrom v. Sproule* (1965), 33 Ill.2d 40.

Defendants also urge that the plaintiff has impermissibly changed the theory of its case from that on which it relied in the first trial. We think that defendants' contention represents an artificial analysis. In some situations there could be, of course, a violation of a covenant not to compete without the breach of a fiduciary duty, as would be the case if Stoner had not been an officer and director of plaintiff. In the present case, however, the acts of

defendants in misappropriating the Lektro-Vend and their use of it to compete against plaintiff are intertwined, the latter being, so to speak, the means by which the former was brought to bear against plaintiff.

We are not confronted here with the situation in which a litigant attempts to interject on appeal a theory never advanced in the trial court. Plaintiff made its theory quite explicit in the trial on remand. It is a familiar principle, moreover, that when an appeal is taken the appellee may defend the judgment below on any ground appearing of record. (*Shaw v. Lorenz* (1969), 42 Ill.2d 246, 248.) We fail to see how defendants have suffered any prejudice from any supposed change in the theory on which plaintiff has presented its case.

The remark made in *People ex rel. Modern Woodmen of America v. Circuit Court* (1931), 347 Ill. 34, 47, relating to piecemeal litigation, on which defendants rely, was made in a discussion of the extent to which matters which had been or could have been litigated in one suit are barred by *res judicata* from being relitigated in a second suit involving the same subject matter. The case is not in point here.

Finally, defendants contend that the evidence offered on the remand and the judgment of the trial court are not in conformity with the allegations of the complaint, since the complaint charges defendants only with breach of the covenants not to compete. For the reasons given above, we do not think the defendants' point is well taken. In any event, so far as the complaint might be thought to be deficient, plaintiff, before submission of this case for decision, filed a motion under Rule 362 to amend the complaint in order to conform it to the proof. Defendants filed objections to the motion, and we took the motion with the case. Essentially the proposed amendment adds to the existing allegation that Stoner indirectly and directly entered into the vending-machine manufacturing business through the provision of financing, advice and use of

facilities, the further allegation that Stoner did so as an officer and as a director and that his actions were "for the development of an economically and functionally successful vending machine complementary to the product line of the plaintiff corporation, all of which was done without the knowledge, consent, or approval of the plaintiff corporation." The motion to amend is accordingly allowed.

Defendants also contend that the covenants against competition contained in the sale agreement and the employment contract were illegal restraints of trade. The basis for this claim is that each covenant covered an excessively broad geographical area, namely an area coterminous with all areas in which plaintiff was doing business, and, in the case of the employment contract, any additional areas into which plaintiff, to Stoner's knowledge, planned to extend its operations. Defendants state that the covenants were broader than the protection necessary to plaintiff warranted and should have been confined to those areas in which the predecessor of Stoner Investments had been functioning.

Defendants further claim that the covenants were in fact not breached, since the activities of defendants fell short of directly or indirectly entering into the vending-machine business. The appellate court concluded, in our opinion correctly, that defendants' activities directed toward the development and thereafter the marketing of the Lektro-Vend, consisting of substantial financial aid, and the provision of physical facilities, as well as defendant's ownership interest in the Lektro-Vend enterprise, were so substantial as to go beyond the limits established by the covenants.

Regardless of the appellate court's disposition of those restraint-of-trade issues, the defendants may, as we have pointed out, be held liable on the ground of a breach of fiduciary obligation on the part of Stoner. Although arguing in their brief that the covenants not to compete

are wholly invalid, defendants somewhat inconsistently maintain in this connection that those same covenants were effective limitations upon what might otherwise be the full sweep of their fiduciary duties. In this connection defendants rely on *Anderson v. Dunnegan* (1933), 217 Iowa 672, 250 N.W. 115. That case, like this one, involved a charge that business opportunities of an enterprise had wrongfully been diverted to an outside concern. The business there involved was originally conducted as a partnership and later incorporated. The decision rendered against plaintiffs, however, was based on the court's finding that a majority of the other partners, subsequently stockholders in the corporation when the latter was formed, had knowingly acquiesced in the diversion. No such elements play a role here.

At the original trial defendants raised as an affirmative defense and by way of counterclaim a charge that the sale agreement and the employment contract violated both the Illinois Antitrust Act (Ill. Rev. Stat. 1973, ch. 38, par. 60–1 *et seq.*) and the Federal antitrust laws (15 U.S.C. sec. 1 *et seq.*). The latter charge was withdrawn by defendants on the remand, and references in the record indicate that at some point a suit was filed against plaintiff in the United States District Court for the Northern District of Illinois relating to the alleged violations of Federal law.

With respect to the State antitrust claim the appellate court on the first appeal affirmed the action of the trial court in striking the affirmative defense and counterclaim. On the remand defendants unsuccessfully sought to reinstate their defenses and counterclaim, and the appellate court again affirmed the judgment of the trial court in this respect. By leave of court the State of Illinois has filed a brief supporting defendants' position on this issue.

There is some dispute between the parties as to whether the first opinion of the appellate court was based on the theory that the Illinois act was preempted by the

Federal antitrust laws or upon the inapplicability of the Illinois act because of the absence of a substantial impact in Illinois arising out of the acts complained of.

We prefer to dispose of this issue on another ground, namely that the Illinois act, having been enacted in 1965, long after the contracts here in question were entered into, cannot properly form the basis of a counterclaim by defendants. It is familiar doctrine that statutes will ordinarily not be construed so as to produce retroactive application, absent some clear expression of an intention to do so. The rule is peculiarly applicable, for constitutional reasons, where a criminal statute is involved. Such is the case here with the Illinois Antitrust Act, even though the particular portion of the Act being relied on is the section creating a right in private parties to bring a civil suit for damages, including in some instances treble damages. Ill. Rev. Stat. 1973, ch. 38, par. 60—7.

Various challenges are made by defendants to the evidence of damages which was adduced by plaintiff with respect to the $7,345,000 judgment entered against both defendants jointly. To a large extent defendants' objections represent no more than a rejection of the underlying theory of liability which we have held is applicable, namely, that plaintiff is entitled to be compensated for the difference between the profits which it could reasonably be expected to make if it had been the owner of the Lektro-Vend and the profits which it did in fact earn from the sale of candy-vending machines.

In our consideration of this facet of the appeal we are mindful of two limiting factors. The first is that the loss of profits, whether past or future, claimed to arise out of exclusion from a market is customarily not susceptible of detailed or direct proof, and that unless proof of an inferential character is permitted, the result would be to immunize a defendant from the consequences of his wrongful acts. That principle has been frequently enunciated by the Supreme Court of the United States in the context of actions to recover damages resulting from

violations of the Federal antitrust laws. (See *Bigelow v. RKO Pictures, Inc.* (1946), 327 U.S. 251, 264-265, 90 L. Ed. 652, 660; *Zenith Radio Corp. v. Hazeltine Research, Inc.* (1969), 395 U.S. 100, 123-124, 23 L. Ed. 2d 129, 148-149, 89 S. Ct. 1562.) The principle is equally applicable where the claim of lost profits arises from a violation of fiduciary obligations or breach of contract. See *Schatz v. Abbott Laboratories, Inc.* (1972), 51 Ill.2d 143, 147-149.

The second limiting factor is that, as noted in the *Schatz* decision (51 Ill.2d at 149), the assessment of damages by a trial court sitting without a jury will not be set aside unless it is manifestly erroneous.

The judgment of $7,345,000, according to the trial court, was the sum of the profits lost to plaintiff between 1962 and June, 1969, during the period of defendants' breach ($2,135,000), and the diminution in the value of plaintiff's business as of June, 1969, attributable to defendants' activities ($5,210,500).

The former figure was derived from data showing the sales of vending machines, obtained from surveys conducted for plaintiff, corporate records of plaintiff, and publications of the United States Department of Commerce.

The sales data showed that plaintiff, after acquiring the assets of the Stoner Manufacturing Corporation, had a share of the candy-vending market, calculated in terms of the dollar amount of sales, of about 31%, and that for the 10-year period from 1959 to 1969 plaintiff had approximately the same share of the market for vending machines other than those used for vending candy. Between 1962, just before the Lektro-Vend machine came on the market, and 1969, plaintiff's share in the candy-vending-machine market shrank to slightly over 16%, whereas its share of the noncandy-vending-machine market remained stable. Plaintiff's actual sales of candy-vending machines in 1962 amounted to about $5,400,000. In 1969 they were $4,166,000. By way of contrast the sales of Lektro-Vend

rose from $48,000 realized in 1963, its first year of production, to $2,298,000 in 1969. Its sales for the entire period aggregated about $7,000,000.

The theory on which plaintiff proceeded was based on the proposition that if plaintiff had had the Lektro-Vend, it would have continued to hold the same market share that it had before defendants entered the market. By way of illustration plaintiff estimated that it had lost sales of $18,490,000 over the period from 1962 to 1969. After calculating the difference between the sales volume which could be anticipated on that assumption and the actual sales volume, a profit ratio was then applied so as to arrive at the lost profits.

The second component of the judgment, referred to as the diminution in the value of plaintiff's business as of June, 1969, was intended to reflect the fact that after June, 1969, a number of years would be required for plaintiff to regain its former market position. One of plaintiff's expert witnesses calculated this element of plaintiff's damages by making a comparison between the future sales which could be anticipated with plaintiff's share restored and the sales which could be anticipated without such restoration. A profit ratio was then applied to translate the sales figures into lost profits, and the latter figure was discounted so as to reflect present value. A second expert witness employed a somewhat different method whereby he capitalized the amount of what he determined to be the average annual lost profits prior to 1969.

Defendants contend that the underlying data concerning plaintiff's sales volume is based in part upon a survey which, according to defendants, did not cover a representative sample. Defendants' criticism is blunted, however, by their failure to object to the admission of the exhibits containing the information in question.

Moreover, while defendants advert to the substantial difference in amount between the judgment given on the first trial and that given in the second, defendants' brief

fails to charge that the latter was excessive. The amount of the second judgment appears to fall within the range of estimates given by plaintiff's expert witnesses on loss of profits and diminution of value of plaintiff's business. The difference, in any event, is explainable in part by the lapse of time between the first and second trials. Judgment in the first was entered in December, 1966. The hearing of evidence in the second did not commence until April, 1971. Some evidence regarding the extent of plaintiff's damages which was available for the second trial would not have been available in 1965 and 1966.

Defendants also argue that it was improper to award damages for lost profits attributable to a period following the expiration of the covenants not to compete. We have held, however, that defendants' liability is not measured exclusively by these covenants but rests as well on a breach of fiduciary obligations.

In their appeal defendants also challenge the judgment of $170,835 against Stoner individually. That judgment represented the forfeiture of his salary for three years and five months, the period during which the court found that he had breached his fiduciary duties, starting with the loans to Phillips in 1961 and ending with his guarantee of the bank loan to Phillips in 1964.

Defendants' initial contention is that plaintiff's sole remedy against Stoner was to terminate its contract with him, and that in any event plaintiff waived any right to other relief which it may have had by failing to discharge him. The appellate court in each of its opinions rejected this line of argument, and we do so as well. The insertion in an employment contract of an express provision for termination is not to be looked upon as a relinquishment of rights which plaintiff would have had without that provision. Nor do we see in what manner the failure of plaintiff to bring suit against defendants earlier than it did barred it from recovering damages, even assuming, contrary to what the evidence shows, that plaintiff was aware of defendants' breach.

Defendants next contend that the forfeiture of Stoner's salary in addition to the allowance of damages for plaintiff's lost profits constitutes an improper double recovery. The judgment against Stoner did not represent a forfeiture of his total salary but only for the period of time beginning with the breach of his duty of loyalty. In this respect the case at hand differs from *Ely v. King-Richardson Co.* (1914), .265 Ill. 148, where employees who had been discharged for setting up a competitive business were held to be entitled to moneys owed them for a period antedating .that action. It borders upon the frivolous for defendants to claim a right to retain the compensation which the judgment restored to plaintiff.

Defendants' final point is that the trial court "had no jurisdiction to enter two final judgments against Harry Stoner on one count." We have examined the brief filed by defendants in the appellate court on this appeal, and we are in some doubt as to whether the question now under discussion was raised before that court. We are, moreover, unable to discern the meaning of this assertion or to perceive any manner in which defendants have been prejudiced by the fact that two separate judgments were entered. As we have stated, the smaller judgment, entered only against Stoner individually, was designed to recover the salary paid him by plaintiff. The larger judgment was designed to compensate plaintiff for its lost profits. That judgment was entered against both defendants because each had participated in the pattern of wrongful acts on which this suit was founded. Stoner Investments, Inc., is wholly owned by Stoner and his wife, and we do not understand that satisfaction of the judgment for $7,345,000 would require a separate payment of this amount by each defendant.

For the reasons discussed in this opinion the judgment of the appellate court is reversed and that of the circuit court is affirmed.      *Appellate court reversed,*
*circuit court affirmed.*